# The First National Bank of Monmouth
## v.
## William H. Brooks.

*National Banks—Certificate of Deposit with Conditions—Ultra Vires— Embezzlement by Cashier—Liability of Bank—Instructions—Estoppel— Dissenting Opinion.*

1. In an action against a national bank on a certificate of deposit issued by the cashier, by the terms of which the amount deposited was to be paid on a note of the depositor or loaned for his use, it is *held:* That it was within the power of the cashier to receive the money subject to the order to pay it on the note if the payee would receive it; that the conditional un-

dertaking to loan the money, if *ultra vires*, did not make the other parts of the transaction void or relieve the bank from liability to the depositor; and that the debt, being that of the bank, was not discharged by the cashier's embezzlement of a much larger sum of the bank's funds.

2.   A corporation can not avail itself of the defense of *ultra vires* when a contract has been in good faith fully performed by the other party, and the corporation has had the full benefit thereof.

[Opinion filed January 15, 1887.]

IN ERROR to the Circuit Court of Warren County; the Hon. JOHN J. GLENN, Judge, presiding.

Statement by LACEY, J.  This was an action in assumpsit, by defendant in error against plaintiff in error, based on the following certificate of deposit, viz:  "Deposited with First National Bank, by William H. Brooks."

" MONMOUTH, ILL., June 2, 1883.

                                    "Dolls.      Cents.

" Currency .................................$800.

" To be indorsed on his note held by John Brown, or loaned for his use in case Brown won't receive said money.

                        "B. T. O. HUBBARD, ' Ce.' "

The character used was always for that of cashier.  The " Ce." is an abbreviation of the word cashier, as Hubbard swears.   Defendant in error passed the money over the counter of the bank to the cashier while it was in good credit and transacting its ordinary business.   The money was never paid to Brown or loaned or repaid to Brooks.   It was put in the general funds of the bank, not in the private box of Hubbard. It was not put on the books of the bank but an account of it was kept by the cashier by what is called a " deduct tag," placed in the cash drawer for accommodation.   The money remained in the general funds of the bank and was not drawn out by the cashier or any one else as the cashier testified. He also says when the amount represented by " deduct tags," which were kept for the accommodation of the public, was paid, it was erased from the tag, and when partly paid credits were made on the tag.   At night it was the habit of the cashier

to figure the amount of items on the tags and deduct it from the cash, and then the balance would represent the money belonging to the bank. The tag remained there all the time the cashier was there as he swears, in the little tin box, in the day time on the counter, and in safe at night. The bank was closed April 7, 1884. The bank examiner, W. C. Oakley, took possession of the assets of the bank, and on May 2, 1884, turned over the assets to the receiver, Guy Stapp, who refused to allow the claim of the defendant in error; on May 7, 1884, this suit was therefore brought.

The cashier, Hubbard, was a defaulter to the bank for a large amount, much more than the amount of this deposit; and was afterwards, as is said, prosecuted and convicted of the crime of embezzlement and sent to the penitentiary.

The defense was that the money was received by Hubbard in his private capacity and not as cashier of the bank, and that he made use of the money himself and that the bank is not responsible. The jury found for the defendant in error and the court overruled the motion for a new trial and entered judgment on the verdict. To reverse this judgment this writ of error is brought.

Messrs. GRIER & DRYDEN and KIRKPATRICK & ALEXANDER, for plaintiff in error.

That in making the arrangement with Hubbard, as shown by the instrument executed and delivered to him, plaintiff was employing Hubbard as his agent for purposes not within the scope of his duties as cashier, admits of no question. The only basis, under the circumstances, upon which Brooks was entitled to recover, was that the money may have been received by and mixed with the funds of the bank. And the only evidence to sustain this view is that of Hubbard, whose interest evidently is to reduce the number of crimes he committed to as small a compass as possible. The only persons who witnessed the transaction were Brooks and Hubbard. If the money went into the bank it does seem that it would have appeared somewhere. We show conclusively by the directors whose duty it was and who did, from time to time and re-

First National Bank of Monmouth v. Brooks.

peatedly, count the funds and compare them with the books, that no one of them ever heard of the Brooks money or found any such overplus in the cash. This is alike true of the bookkeeper and the other clerks of the bank. The excuse is that it was on a "deduct tag" kept in a drawer. But this deduct tag was frequently referred to, and balances corrected through it, but nothing is ever heard of the Brooks money.

The agreement to pay or loan the money was not within the scope of the authority of a cashier. In that transaction, as shown on the face of it, Brooks was dealing with Hubbard as an individual, making him his agent for a special purpose, with which he as cashier had nothing to do. U. S. v. Bank of Columbus, 21 How. 356.

When there is a conflict of evidence, or when the evidence leaves it doubtful which way the jury should find, the instructions should not only be accurate but clear and perspicuous. Volk v. Roche, 70 Ill. 297; T., W. & W. Ry. Co. v. Moore, 77 Ill. 217; I. C. R. R. Co. v. Hammer, 72 Ill. 347; C., B. & Q. R. R. Co. v. Van Patten, 64 Ill. 510; Village of Warren v. Wright, 3 Ill. App. 602; Ruff v. Jarrett, 94 Ill. 475.

Messrs. STEWART & STEWART, for defendant in error.

Hubbard, cashier, was the general agent and executive officer of the bank. Ryan v. Dunlap, 17 Ill. 40, 46.

The money of Brooks being placed in the general funds of the bank and remaining there, the bank is liable therefor. Marine Bank v. Rushmore, 28 Ill. 463, 472; Cushman v. Ill. Starch Co., 79 Ill. 281; Brahm v. Adkins, 77 Ill. 263; Keers v. Calkins, 1 Met. (Ky.) 415.

LACEY, J. The certificate of deposit, whatever interpretation may be placed on it, is in writing, and we are not obliged to resort to uncertain parol testimony to determine its terms. It purports on its face to be an ordinary contract for the general deposit of money with two requests thereunder written: 1st. An order to pay the amount of the money therein named to John Brown on defendant in error's note held by

him, if he would receive it. 2d. In the contingency that Brown would not receive it the plaintiff in error was ordered to loan it out for defendant in error's use. This certificate was undersigned by B. T. O. Hubbard, cashier of the bank. By signing the certificate of deposit and accepting the money, the plaintiff in error in substance undertook to carry out the two orders or requests.

They might have been withdrawn by defendant in error at any time before Brown notified the plaintiff in error of the acceptance of the trust money held by it, and before the money was loaned.

But the plaintiff in error claims that this undertaking of the cashier in the name of the bank was *ultra vires*, both as to it and his duties as cashier. That inasmuch as he exceeded his authority to act for the bank and the latter's power under the charter, the entire transaction should be regarded as though Hubbard had taken the money into his own hands on his individual account and had agreed with the defendant in error to carry out the requests of the writing without reference to plaintiff in error. Unless this contention of plaintiff in error can be legally sanctioned the theory of the defense entirely fails.

Let us inquire, then, whether the cashier has so far exceeded his powers and those of the bank as to render the accepting of the defendant in error's money on behalf of the plaintiff in error entirely void as a contract with the bank.

The 5th section of the National Banking Law of June 3, 1864, under which the plaintiff in error was organized, gives power to the board of directors to appoint, among other officers, a cashier, and define his duties. The 7th section authorizes all banks organized under the act, by its board of directors or duly authorized officers or agents, to exercise, "subject to law, all such incidental powers as shall be necessary to carry on the business of banking; by discounting and negotiating promissory notes, drafts, bills of exchange, and other evidences of debt, by receiving deposits, by buying and selling exchange, coin and bullion, by loaning money on personal security, and by obtaining, issuing and circulating notes according to the provisions of this title." The cashier is the executive

officer of the bank and transacts most of its business. His acts, to be binding upon the bank, must be done within the ordinary course of his duties, and when so done it is *prima facie* evidence that they fall within the scope of his duty. No proof of an authorization of the board of directors is required. Fletcher v. Bank U. S., 8 Wheat. 338. Some of his duties are to keep all the funds of the bank, its notes, bills and other choses in action, to draw checks, to withdraw the funds of the bank where they have been deposited, receive deposits and issue certificates of deposit, and such certificates only require the signature of the cashier. Barnes v. Ontario Bank, Smith, (N. Y.) 152. When money is deposited in a bank generally, it is the property of the bank, and can not be paid out without the order of the depositor. Carroll v. Cone, 40 Barb. 220.

The cashier had the power to receive for the bank the defendant in error's money on general deposit and the terms of the certificate show that he did so receive it.

The identical money was not to be kept separate, only the same amount was ordered to be paid out to John Brown, or loaned in case John Brown would not receive it. The money was paid over to the cashier at the counter of the bank by defendant in error, and was received for the bank as the certificate shows. This much of the transaction was not outside of the ordinary duties of the cashier or *ultra vires* as to the bank, and it was certainly for its benefit to receive the deposit, nor was it *ultra vires* to accept the money to be paid to John Brown in case Brown wanted it. For both the receiving and the paying out of the money were within the ordinary duties of the cashier, and it could make no difference whether the defendant in error gave the order to pay it out at the time the deposit was made or afterward. If there was anything the bank was not able to do it was to loan the money on defendant in error's account. If the bank was unwilling to proceed to loan the money in case such remote contingency arose, it had only to notify the defendant in error and pay the money back to him or on his order. No liability could attach to the bank on account of the failure to loan the money under the contract. That portion of the undertaking would alone

be void.   Authority supporting this view is found in the case of the Bank of the U. S. v. Dunn, 6 Pet. 51.

Dunn was about to become the indorser of a promissory note, whereupon the president and cashier of the bank represented to him that he would never be called upon to pay it; that the bank had a deposit of collateral stock of another bank, left by the principal maker of the note as security, and that his signature was a mere matter of form.   On the faith of such representations he signed the note.   This defense was excluded by the court below, and on appeal to the Supreme Court of the United States that court held it was properly excluded and affirmed the judgment against Dunn on his indorsement.   The court in passing on the point said "that the most decisive objection was that the agreement was made with persons who had no power to bind the bank.   It is not the duty of the cashier and president to make such contracts, nor have they the power to bind the bank except in their ordinary duties.

"All discounts are made under the authority of the directors, and it is for them to fix any conditions that may be proper in loaning money.   *   *   *   The assurances relied upon, if made, were not made by persons authorized to make them.   The bank is not bound by them, nor would it be bound if the assurances had been made in so specific and direct a manner as to create a personal responsibility on the part of the cashier and president."

It will be observed in the above case that the court held that portion of the contract good that came within the power of the president and cashier to make, to-wit, the taking of an unconditional indorsement from Dunn.   That portion done without power which was in favor of Dunn was rejected.

So here, the plaintiff in error's cashier was fully authorized to take deposits for the bank, but in attaching a stipulation to it that he was not authorized to make, such condition would be void, but the contract to repay in such cases implied from the fact of deposit would be good as to his principal.   The defendant in error, as appears from the certificate, was willing to trust the plaintiff in error with his money but not the cashier individually.

First National Bank of Monmouth v. Brooks.

The case of the United States v. The City Bank of Columbus, Ohio, 21 How. 356, is not in point or parallel to the case at bar.    There the cashier of the bank sent a letter to Thos. Corwin, the treasurer of the United States, stating that the bearer, Col. Wm. Minor, a director of the bank, was authorized on behalf of the bank to contract with the government for the transfer of money from the east to the south and west.    The letter being presented by Minor to Corwin, the latter contracted with him in behalf of the bank to receive $100,000 and transfer it from New York to New Orleans free, and gave Minor a draft on the United States treasury in New York City for that sum.    Minor gave his receipt for it, drew the money and never showed up with it.    The United States sued the bank.    The court below instructed the jury in favor of the bank and on appeal the Supreme Court sustained the instruction, and it was held that, as the cashier had no authority from the board of directors, he could not appoint Minor to enter into such a compact or go to Washington and receive the money to transfer it to New Orleans.

But suppose Corwin had paid this money over the counter of the bank to the cashier and taken a certificate of deposit with an agreement that the bank should transfer it to New Orleans free of cost, would not the bank have been liable for the amount in case the cashier had absconded with the money? The cashier can not delegate his authority to any other person to receive money on deposit for the bank, much less send a messenger out of the State to receive it without authority from the directors.

The case of Bushnell v. The C. C. Ntl. Bank, 10 Hun, 378, seems to be quite in point.    Bushnell and one Shaw entered into a contract for the sale and delivery of 10,000 barrels of crude petroleum, September 24, 1874, at a stipulated price, to be delivered to Shaw at buyer's option any time from that date to December 31, 1874.    The cashier indorsed the following agreement on the contract: "September 26, 1874, T. A. Shaw has this day deposited in the Chautauqua County National Bank of Jamestown, New York, $2,500, which is to be held by us as security for the faithful fulfilment of the within contract."    Signed by the cashier.

This contract was then delivered to Bushnell. Shaw losing on the deal to the amount of the deposit, and the bank refusing to pay according to agreement, Bushnell brought suit, and failing in the court below, an appeal was taken to the fourth judicial department of the general term of the Supreme Court, which reversed the judgment of the court below.

The defendant set up *ultra vires* as against the plaintiff. The court by Judge Smith, held that the "bank impliedly promised that in case Shaw failed to perform, the bank would pay to the plaintiff in damages thereby incurred, $2,500." "The bank had power to receive the deposit. As an incident to that power, it had authority to assent to any terms or conditions respecting the use or disposal of the money deposited which the depositor saw fit to impose, provided they were not illegal or prohibited by defendant's charter. If Shaw had chosen to deposit it payable absolutely to plaintiff or his order, the receipt of it by the bank and the issuing of a certificate in accordance with those terms would have been strictly within its legitimate and ordinary business." The court held "that it could make no difference that the deposit was payable to the plaintiff upon the happening of a future contingent event and that the amount to be paid was contingent and uncertain; * * * but was not to exceed the amount of the deposit." "It is said there was a trust created. In the same sense there is a trust in case of every bank deposit by one person to the use of another."

The instructions in the case at bar given for the defendant in error, complained of, commence with the hypothesis that "if the jury believe, from a preponderance of the evidence, that defendant in error deposited in the First National Bank the sum of $800 * * * and if this was mingled with the money of the bank * * * then defendant in error could recover in this suit even if the cashier had taken out a much larger sum of money."

If the money, as the instructions suppose, was deposited *with the bank* and not with the cashier as an individual, the defendant in error has a legal right to recover whether the money was afterward mingled or not. If the first fact of the

deposit was true in the manner supposed it would be wholly immaterial whether the last one of mingling was or not. As the certificate shows the money was contracted to be and was put into the *bank* by the cashier, who had full authority to receive general deposits, the right of the defendant in error to recover was complete without the further act of mingling such funds with those of the bank. If the plaintiff in error received the money of the defendant in error on general deposit through its cashier, and also by its cashier mingled it with the general funds of the bank, from that moment the latter became the debtor of the former, which might by the terms of the certificate of deposit be discharged by paying the money to John Brown, or by loaning it out for the use of defendant in error. If the bank saw proper it might also discharge such debt by loaning it as required by the terms of the certificate, though it could not be compelled by law to do so, but if Brown would not receive the money and the plaintiff in error would not loan it, the liability to repay the same amount of money to defendant in error or on his order or direction became fixed, and the debt could not be discharged by reason of the embezzling of the funds of the bank by its cashier to a greater amount than the deposit. If the deposit had been made with the cashier as an individual and not as the legally authorized officer of the bank such a defense would be possible, but not otherwise. This was not the nature of the transaction. The defendant in error as well as the cashier understood that the transaction was with the bank, and as a strong circumstance showing such intent the money at the time was mingled with the bank's funds. The undertaking by the bank to loan the money for the use of the defendant in error was not illegal as being against public policy, or immoral, nor was there any express prohibition in its charter against such acts. Even if the plaintiff in error had exceeded its powers by its agreement to loan the money, the act to be done was not immoral or against public policy nor was it even prohibited by its charter and therefore if it had proceeded to the execution of the contract so far as to receive the money in question on deposit to await the opportunity to make the loan

or pay it to John Brown, it would be estopped from setting up the plea of *ultra vires* to defeat recovery for the money so deposited. The very able Judge Allen, of New York, lays down the following rule on the subject:

"When the acts of corporations are spoken of as *ultra vires*, it is not intended that they are unlawful or even such as the corporation can not perform, but merely those which are not within the powers conferred upon the corporation by act of its creation, and are in violation of the trust reposed in the managing board by the shareholders, that the affairs shall be managed and the funds applied solely for carrying out the objects for which the corporation was created. * * * The plea of *ultra vires* should not as a general rule prevail, whether interposed for or against a corporation, when it would not advance justice, but on the contrary would accomplish a legal wrong." Whitney Armes Company v. Barlow et al., 63 N. Y. 62. In the above case it is laid down as a further rule and as being well settled "that a corporation can not avail itself of the defense of *ultra vires*, when a contract has been, in good faith, fully performed by the other party, and the corporation has had the full benefit of the performance and of the contract." "If an action can not be brought directly upon the agreement, either equity will grant relief or an action in some other form will prevail." These rules presuppose that corporations may enter into contracts through their officers and perform them, and the party with whom they contract may perform them, and yet such contracts be without the powers granted, and if the corporation or either party receive a benefit, it or he must make compensation after the contract is performed. But while the contract is executory, it may be repudiated by either party. In the meantime if either party has received a benefit he must make compensation on the principles of natural equity.

Applying these rules to the facts of this case, we find that the instructions presuppose that the cashier received the money in question on behalf of the bank from defendant in error as a general deposit and mingled it with the money of the bank, and that it became a part of the funds of the

First National Bank of Monmouth v. Brooks.

bank indistinguishable from any other funds. If the agree-
ment to loan the money was *ultra vires* either party to the
contract might repudiate that part of it before the money
was paid out or loaned under the agreement. If paid out or
loaned the bank could recover the usual compensation for its
services notwithstanding the acts performed might have been
beyond its powers; on the other hand defendant in error
may recover from the bank the money received by it. The
obligation based alone on the grounds of estoppel arose as soon
as the money was received on deposit and much more when
mingled with the funds of the bank. It became a debt due
from the bank which the law would not allow it to deny and
a cause of action arose after demand and refusal to pay. The
cashier by authority of the directors had possession of all the
bank's funds, not the money in question alone, but all; and he
fraudulently appropriated a large amount of its cash capital
to his own use, and much more than the amount of this
deposit. Why should defendant in error be charged with the
defalcation any more than any other depositor? Because he
authorized appellant to pay John Brown? That could not
be, for it was a part of the cashier's legitimate duties to draw
money out of the bank to pay depositors, or the debts of the
bank at the order of depositors, regardless of whether the
order was made at the time of deposit or afterward; and if in
performing this duty the cashier stole the money, the loss
should fall on the bank and not the depositor. He was the
servant of the bank. After this money was received by the
cashier on deposit and much more after it mingled with the
funds of the bank, defendant in error's claim against it was a
chose in action, and not the subject of larceny; therefore the
theft by the cashier must be borne by the bank. If it be con-
tended that the bank had no notice that the money so mingled
with the funds of the bank was not the money of the cashier
and that by reason thereof it has an equitable right to set off
the amount of money wrongfully abstracted by the cashier
against the deposit of defendant in error, it is answered that
the want of notice can not be set up against his equitable
claim as an estoppel for the reason that it has been put in no

worse condition on account of want of notice. The money was not paid out to the cashier supposing the bank owed him. As a matter of fact the bank did not owe him but owed defendant in error and the want of notice if there was such want, which is not admitted, had no effect to cause the larceny. The plaintiff in error is in no worse condition on the account of the want of notice. The bank, however, is held to notice where the cashier receives the money by virtue of his authority as cashier, as here.

What is said here is said in reference to the form of the instructions complained of and to show that they are not erroneous. As there was no serious contradiction as to the proof it is not necessary to discuss it further than to say it justifies the verdict. The judgment in the opinion of a majority of the court should be affirmed and it is accordingly done.

*Judgment affirmed.*

Dissenting opinion by WELCH, J. I do not concur in the reasoning or the conclusion reached by my brethren in this case. The 8th section of the act of Congress under which national banks are organized, makes them banking corporations with " all such incidental powers as shall be necessary to carry on the business of banking by discounting and negotiating promissory notes, drafts, bills of exchange, or other evidence of debt; by receiving deposits; by buying and selling exchange, coin and bullion; by loaning money on personal security; and by obtaining, issuing and circulating notes according to the provisions of the act." The powers of national banks, being enumerated in the act of Congress by which they are created, the *expressio unius est exclusio alterius* if applied in the interpretation of this act would prohibit national banks from entering into such a contract as that claimed to have been entered into in this case.

" The deposits referred to in the act are deposits of money received by banks in the usual course of business and have none of the qualities of a *bailment.* The money deposited becomes the money of the banks and the relation of debtor and creditor is created between the depositor and the bank." Whitney v.

First National Bank of Brattleboro, 50 Vt. 398; same rule announced in Wiley v. First National Bank of Brattleboro, 47 Vt. 546; First National Bank v. Ocean National Bank, 60 N. Y. 278; Wickler v. First National Bank, 42 Ind. 581.

Angell & Ames on Corporations, 256, says: "In deciding whether a corporation can make a particular contract, we are to consider in the first place whether its charter or some statute binding upon it forbids or permits it to make such a contract; and if they are silent upon the subject, in the second place, whether the power to make such a contract may not be implied on the part of the corporation as directly or incidentally necessary to enable it to fulfil the purposes of its existence, or whether the contract is entirely foreign to that purpose."

The contract, if any, between the plaintiff in error and the defendant in error, is based upon this paper:

"Deposited with the First National Bank by Wm. H. Brooks.

MONMOUTH, ILL., June 2, 1883.

Currency—$800.   To be indorsed on his note held by John Brown, or loaned for his use in case Brown won't receive said money.

B. T. O. HUBBARD, Ce."

Judge Wayne, in United States v. City Bank of Columbus, 21 How. (U. S.) 356, says: "The court defines the cashier of the bank to be an executive officer, by whom its debts are received and paid, and its securities taken and transferred, and that his acts, to be binding upon a bank, must be done within the ordinary course of his duties. His ordinary duties are to keep all the funds of the bank, its notes, bills and other choses in action, to be used from time to time for the ordinary and extraordinary exigencies of the bank. He usually receives directly, or through the subordinate officers of the bank, all the money and notes of the bank; delivers up all discounted notes and other securities when they have been paid; draws checks to withdraw the funds of the bank when they have been deposited, as the executive officer of the bank, transacts most of its business."   After this summary of the

duties and powers of the cashier, the same Judge says, "*that he may not make any contract involving the payment of money not loaned in the usual or customary way,* or purchase or sell property, or create an agency of any kind for the bank unless expressly authorized by those to whom it has been confided to manage the business of the bank, both ordinary and extraordinary." The same rule as to the limits of the authority of bank officers, to bind the corporation to acts and contracts within the ordinary sphere of their duties and the scope of the ordinary business, is announced in the following cases: Minor v. Mechanics Bank of Alexandria, 1 Pet. 46–70 ; Flickner v. Bank of United States, 8 Wheat. 338; Fulton Bank v. New York and Sharon Canal Co., 4 Paige, 127. Under the rule announced in the authorities, *supra*, had Hubbard, as the cashier of the bank, authority to receive for the bank money on the terms stated in said paper, and to bind the bank therefor? as said in Whitney v. First National Bank of Brattleboro, 50 Vt., *supra:* "The deposits referred to in the act are deposits of money received by banks in the usual course of business, and have none of the qualities of a bailment. The money deposited becomes the money of the bank, and the relation of debtor and creditor is created between the depositor and the bank ;" same rule announced in Commercial Bank of Albany v. Hughes, 17 Wend. 94; Maine Bank v. Fulton Bank, 2 Wall. 252. This is the character of deposit which by the National Bank Act, *supra*, the plaintiff in error was authorized to receive, and in receiving such a deposit the cashier would be acting within the scope of his authority and the bank by his act would become a debtor to the depositor. Does the paper signed by Hubbard, *supra*, show the reception by him of such a deposit for the bank? In my opinion the alleged contract is entirely foreign to the purpose of the plaintiff in error corporation, and is *ultra vires* and imposed no duty or obligation upon the bank. Bullard v. Banks, 18 Wall. 385; Hood v. Armory, 2 Cr. 107. The defendant in error in depositing his money with Hubbard was under the law required to know whether he had authority as cashier of plaintiff in error to receive it on the terms fixed by him, and, as I think I have

shown, that no such authority existed. The money must have been left with Hubbard as his agent, and not deposited with the plaintiff in error. This view is sustained by Hubbard, who says: "Brooks came to me and gave me the money and requested me to pay it to Deacon Brown, and in case Deacon Brown would not receive it to loan it out for him. It was a personal request to me." Brooks and Hubbard both seemed to realize that Hubbard had no authority to receive it for the bank on such terms. It was a "personal request" to Hubbard to make the application of the money. If Hubbard, as the cashier of plaintiff in error, was not acting in the limit of his duty as such cashier when he received the money from Brooks, then he received the money as the agent of Brooks. Man. Co. v. Lydig, 4 I. R. 377; Satislee v. Grant, 1 Wend. 272; Thatcher v. Bank of N. Y., 5 Sandford, 121; Lloyd v. Bank, 3 Harris (Pa.) 175; Lithbridge v. Phillips, 2 Stark. 544. Even if it should be conceded, which I do not, that the plaintiff in error could receive money on the terms stated in the paper signed by Hubbard, *supra*, that would make it a gratuitous undertaking, and as such it would only be responsible for gross negligence. Wharton on Negligence, Sec. 470; Edson v. Weston, 7 Con. 278; Beardsly v. Richardson, 11 Wend. 25; Sandusky v. McFarland, 3 Dana, 204.

I hold that no liability on the part of plaintiff in error was incurred on the paper given by Hubbard to the defendant in error. Has anything transpired since to create a liability on the part of plaintiff in error to the defendant in error? Hubbard states: "I did not pay it to Deacon Brown, I did not loan it for Brooks, I put it in the general funds of the bank. It was kept with some other items on a little memorandum paper I kept in the drawer, called a 'deduct tag,' in the cash drawer for accommodation. It was so I could pay it to Deacon Brown when he called for it." There was no entry made upon the bank books of this money, if there had been it should have been placed to the credit of Hubbard, it having been left with him to pay to Brown or loan for Brooks. If it had been placed to the credit of Brooks it would have required the check of Brooks to have used it. What was

written on the "deduct tag" in reference to this money we do not know. It is certain there was nothing written upon it which would have prevented Hubbard from at any time withdrawing the money. It was not placed to his credit on the books so that his check would have been necessary to withdraw it. It was not placed to the credit of Brooks so that his check would have been necessary to withdraw it. The evidence of the directors of the plaintiff in error shows that they did from time to time and repeatedly count the funds and compare them with the books; that no one of them ever heard of the Brooks money or found any such overplus in the cash; that on some occasions balances were corrected through "deduct tags," but nothing is known of the Brooks money. Hubbard states the "deduct tag" was left there; no one else connected with the bank remembers to have seen it or knows what became of it. The only basis on which Brooks was entitled to recover was that the money was received from Hubbard and mixed with the funds of the bank and was never withdrawn from the bank by him or by his authority.

Various errors are assigned as to the giving, refusing and modifying of instructions.

The instructions given for the defendant in error authorized the jury to find for the defendant in error, although the jury might believe that Hubbard took from the funds of the bank a much larger amount of money than claimed in this case. In my view the evidence conclusively shows that Hubbard had not only withdrawn the money left by Brooks with him, if it was ever mixed with the funds of the bank, but also had withdrawn all of the money of the bank. Yet under the instructions for defendant in error the jury were authorized to find for defendant in error. This notwithstanding Hubbard says "I so placed it that I could withdraw it." He must have exercised that right to withdraw it, for he left no money in the bank when he left it. In the view I take of this case, the instructions given for the defendant in error should not have been given, and the instructions given for plaintiff in error should have been given without modification.