(48 Misc. Rep. 248)

### EVANS v. NATIONAL BROADWAY BANK.

(Supreme Court, Special Term, New York County. September, 1905.)

1. BANKRUPTCY—INSOLVENCY—EVIDENCE.

A person opened an account with a bank, which discounted paper for him to the amount of $20,000 on his statement that he had assets amounting to $63,000. After nine months, during which the bank received reports prejudicial to his credit, he had reduced his indebtedness to $13,000, and declared that he could not pay the remainder of his debt. A few days later the bank made an arrangement with him under which he made 11 successive assignments of accounts between April 12th and May 21st, aggregating in all $60,000, covering all his uncollected accounts. The bank made the collections and passed the proceeds to a separate account, out of which it paid his checks for about $20,000, drawn on his personal account, until May 19th, when it refused to pay a note. After he had turned over his business to a third party the bank had refused to reassign the claims to provide working capital. A petition in involuntary bankruptcy was filed, and after adjudication the trustee sued to set aside the assignments to the bank as made to hinder creditors, and to recover proceeds of collections as an unlawful preference. The bank, after petition filed, continued to collect the assigned accounts, and after paying debts turned over the balance to the trustee. While the assignments were being made, his liabilities became $12,000 more than his assets, while before that time they were only $8,000 more. *Held* sufficient to establish his insolvency when the assignments were made. The claim that it was not established because the good will of the business was not taken into account cannot be considered, as, under the circumstances, there could have been no good will.

2. SAME—UNLAWFUL PREFERENCES—RECOVERY BY TRUSTEE.

   Where there was evidence showing the debtor's insolvency and a knowledge of the same by a bank to whom he had made assignments of his outstanding accounts, the trustee in bankruptcy could recover so much of the bank's collections from transfers made within four months as had been applied to the payment of the indebtedness due it at the time the arrangement was made with the bankrupt for the assignment of the claims, but could not recover the remainder of the fund, which had been applied by the bank to the payment of the bankrupt's liabilities to third persons.

Action by Samuel M. Evans, trustee in bankruptcy, of the estate of J. Samuel Jacobs, against the National Broadway Bank. Judgment for plaintiff.

See 85 N. Y. Supp. 101.

Frederick E. Kessinger (Herbert R. Limburger, of counsel), for plaintiff.

Sullivan & Cromwell (William V. Rowe and Waddill Catchings, of counsel), for defendant.

LEVENTRITT, J. In the month of February, 1901, J. Samuel Jacobs, who had theretofore been a partner of one McCafferty in the paint business, started in the same line on his own behalf. They soon became involved in litigation respecting the ownership of a trade-mark which was deemed to be of considerable value. In April, 1901, Jacobs opened an account in the defendant bank, and, in order to obtain discount accommodations, he submitted a statement of his financial condition wherein he claimed that he was worth over all his liabilities the sum of $63,800, including an equity of $10,000 in real estate. On the strength of that statement the defendant discounted his note at four months in the sum of $10,000, due August 25, 1901. Prior to its maturity, and on July 3, 1901, the bank discounted for Jacobs another four months' note for $10,000. This latter note became due October 3, 1901. Both notes were unindorsed and wholly unsecured. When the first note matured, it was renewed in full for two months; the renewal note maturing October 26th. On October 3d, when the second note fell due, it was reduced by the payment of $4,000 on account, and for the remaining $6,000 a new note, due January 3, 1902, was given to the defendant. Jacobs defaulted in the payment of the first renewal note, which became due October 26th, but three days later he paid $1,000 on account, and gave the defendant a renewal note, due December 30th, for the remaining $9,000. Upon Jacobs' default, and in the end of October, 1901, a mercantile agency rendered to the defendant a report of Jacobs' financial condition containing, among others, these statements:

"Jacobs, J. Samuels, Mfg. White Lead & Paints, Brooklyn, N. Y.

"The old firm manufactured a brand of white lead known as 'Gold Seal,' and also controlled several trade-marks, which both are now using. Jacobs claimed the exclusive right to the trade-mark 'Gold Seal,' and brought an action against McCafferty to restrain him from using it, but the case was decided in McCafferty's favor. There is the strongest kind of competition between them, and prices are cut on both sides. It is thought likely that there will also be further litigation. Jacobs has all along had the reputation of being a liberal spender, and authorities believe that he is the least able to stand the strain. It is said that he has now got prices down to a point where there is

nothing in the business. His payments locally are somewhat tardy, and the general tendency is to watch the account closely. An out of town authority, to whom he owes about $1,500, considerably past due, is unable to collect, and talks of beginning suit.
 "September 26th, 1901."

"From out of town sources we learn that he is still owing a balance of about $1,500 on machinery and other overdue accounts of about $2,000. In some cases, however, he pays promptly for indispensable current requirements. His indebtedness is believed fully $10,000.
  "Oct. 31, 1901."

A few weeks later the defendant received a further report from the same source, and Jacobs was therein referred to in this language:

"It is said that he has now got prices down to a point where there is nothing in the business. His payments locally have become so tardy that some of the conservative dealers no longer solicit his trade, and we are unable to attain any definite estimate as to his financial worth."

Thereupon the defendant pressed Jacobs to reduce his $15,000 indebtedness, and he promised to apply the proceeds of his real estate then in process of condemnation to the reduction of the debt. No payment was made on the $9,000 note, which fell due on December 30, 1901, but a renewal note of like amount, maturing March 3, 1902, was submitted. One thousand dollars was paid on January 3, 1902, on account of the $6,000 note then maturing, and the balance of $5,000 was renewed until April 3, 1902. One thousand dollars was paid on March 3, 1902, on account of the $9,000 note then maturing, and the balance of $8,000 was renewed until May 3, 1902. In February, 1902, Jacobs realized $6,750 for his real estate interests; but, instead of devoting any part of it to the reduction of his indebtedness to the defendant, as he had promised, he turned it into the business, which thereupon comprised his entire property. In March, 1902, the defendant learned that Jacobs was living extravagantly or beyond his means. The fact is that he was drawing from the business for personal expenses about $15,000 a year. On April 3, 1902, when the $5,000 note matured, Jacobs informed the defendant that he was unable to pay any part of it, whereupon he was required to give in substitution a new note having but six days to run, and its acceptance by the defendant was coupled with the warning that it must be paid when due. It was nevertheless protested for nonpayment; Jacobs having failed even to appear at the bank until sent for on the following day.

Then followed the arrangement which has given rise to the present litigation. Up to that time the defendant had neither indorsement or collateral of any kind to cover its claims. It was then agreed that Jacobs should assign outstanding accounts to the defendant, in which event the defendant would, at its option, from the collections thereof, make further advances or loans to Jacobs, so as to enable him to prosecute his business. Pursuant to that arrangement Jacobs assigned to the defendant on April 12, 1902, certain of his outstanding accounts, amounting to $7,100, and thereafter, and until May 21, 1902, he continued to do so, making in all 11 different assignments, aggregating $47,920.34, and covering claims not only for all shipments as soon as made, but also all his uncollected accounts which had accrued prior to April 12, 1902. This state of facts is shown on the face of the lists attached to the assignments. The defendant gave to Jacobs written

authority, as its agent, to collect for its account all the assigned claims, and it opened what it termed his "collateral" account, devoted to entries of the collections which he made and turned over to it, as distinguished from his "personal" account. Although at no time during the period that Jacobs was making these assignments to the defendant had he any balance to his credit in his personal or deposit account, he drew checks on the defendant, relying upon it to honor them, though he had no agreement or assurance upon which to base such reliance. To the extent of $19,750 the defendant paid these checks and certain maturing notes held by creditors of Jacobs, and from time to time of its own volition transferred from the collateral to the personal account sums just sufficient to meet the payment of these checks and notes. That course was pursued by the defendant until May 19, 1902, when it refused to pay a promissory note then maturing, payable at the defendant bank, held by one of Jacobs' merchandise creditors and duly issued by him in the conduct of his business. This refusal brought matters to a crisis. The creditor who held the dishonored note called upon the president of the defendant bank, and he then advised, as he had previously suggested, that Jacobs should be induced to turn over the management of the business to one Aquilla Rich, who had had long-continued experience, and who had been in the employment of Jacobs from the beginning; and the president maintained that, unless such a change was made, the result would be disastrous to all parties interested. The creditors thereupon persuaded Jacobs to adopt the suggestion, and, having accomplished this, requested the defendant to co-operate with them by reassigning and surrendering claims, so as to provide the business with the funds necessary to its further prosecution. Upon its refusal they, on June 4, 1902, filed a petition in involuntary bankruptcy. Jacobs was thereafter duly adjudicated a bankrupt, and the plaintiff was elected trustee. In that capacity he brings this action to set aside the transfer of the accounts, claiming that the effect thereof was to hinder, delay, and defraud the creditors of Jacobs, or, failing in that, to recover the amount of such claims as the defendant collected on the ground that it thereby acquired an unlawful preference.

The defendant continued, after the bankruptcy proceedings, to make collections of the assigned claims, and having realized therefrom a sum sufficient to cover the unpaid notes held by it, aggregating $13,000, together with the expenses of collection, turned over to the plaintiff, as trustee in bankruptcy, the remaining uncollected claims, aggregating $12,478.65, and an over-surplus of $598.21 in cash. Of the reassigned claims the plaintiff has collected only $1,849.47. The balance of $10,-629.18 are worthless and uncollectible. Upon a public sale on the 12th of July, 1902, the stock, machinery, and other tangible property of Jacobs realized $5,700. For all the assets which Jacobs owned on the 17th day of July, 1902, the sum of $10,063.55 was realized, and the debts owing by Jacobs on that day, as proved and allowed in bankruptcy, aggregated $31,879.34, thus showing Jacobs' insolvency in excess of $21,-000, and affording, after payment of expenses, no more than a possible 25 per cent. dividend to his creditors on their respective claims. On April 10, 1902, when Jacobs and the defendant entered into the arrangement for the assignment of accounts, there was an excess of lia-

bilities over assets by about $8,000, and from that time to May 21, 1902, the period covered by the making of the assignments, that excess gradually increased. until on the last-mentioned date the excess had amounted to nearly $12,000, although the sales made in the interim aggregated over $21,000.

Notwithstanding this clear exhibition of insolvency, the defendant insists that Jacobs was not insolvent, for the reason that the computation upon which that result is reached excludes the value of the good will of the business. That good will is an addable asset in figuring solvency or insolvency is sound law. Chicago Title & Trust Company v. John A. Roebling's Sons Co. (C. C.) 107 Fed. 71. The difficulty, however, is that I fail to find any good will left in this business either at the date when the first assignment of accounts was made, or at any time thereafter. A business which in one year converted a surplus of $63,000 into a deficiency of $8,000 can hardly lay claim to substantial good will. No attempt is made to reconcile this disastrous showing with the claim of a continued good will, except by pointing to the extravagant drafts of Jacobs. But even at the maximum amount of $15,000 a year the major part of the decline still remains to be accounted for. Rich's estimate that the business was a good, active, paying one hardly seems borne out by the figures, and would argue rather what the business might become under efficient management than what it was in fact. But what a business might be is not an element that we may consider in estimating the value of good will. Good will is something that has been created, not something which must yet be brought into being. There was some attempt on the part of the president of the defendant to value the good will as an expert, but the testimony is wholly unsatisfactory. Waiving the lack of qualification to testify as to this particular business, the valuation is guesswork and rests really on Rich's estimate, which the rapid destruction of assets renders faulty as a foundation. The mere fact of the necessity of making such an arrangement as Jacobs made with the defendant does not argue a prosperous condition at the time of the assignments, while the period following, the transactions of which are more directly before the court, shows a further loss. With the business conducted substantially as theretofore, with no knowledge by the creditors of the assignments, with the management in the same hands, with sales of $21,000 taking place in what are conceded to be among the best months of the year, the net result of the 40 days' activity is a loss of about $4,000. Without going into further details I think the conclusion is clear that there was no good will to this particular business, and that it was insolvent within the meaning of the bankruptcy act throughout the period of the assignments.

The debtor thus having been insolvent, and the transfers having been concededly made within the four months' period, there remains to be considered the knowledge of the bank of the debtor's condition, and whether it had reasonable cause to believe that the debtor intended to give it the preference which it in fact secured. Benedict v. Deshel, 177 N. Y. 1, 68 N. E. 999. The record does not leave it open to serious dispute that Jacobs assigned his entire outstandings and that the bank required and knew of this wholesale transfer. It is unnecessary

to cite the many corroborative items in the evidence, as the assignments on their face show that all the accounts, past and present, were set over. It is further clear that there was no definite arrangement or agreement to what extent, if any, Jacobs was to receive financial assistance or facilities to meet current or accruing obligations.

While the discount by a bank of a depositor's note secured by assigned accounts as collateral is an ordinary incident of dealings between banks and their customers, it is entirely unusual, as admitted by the defendant's officers, to have such a vague understanding as obtained in this case, where, in consideration of a depositor placing himself absolutely at the mercy of the bank, it in return does not bind itself to do anything at all. The indefiniteness of the arrangement is emphasized by the bank's sudden withdrawal of its support, arbitrarily and without notice, when the note maturing May 19th was refused payment. This indefinite arrangement, viewed in the light of the assignment of all the accounts, and made after the bank was reasonably put upon inquiry by the warnings contained in the facts of the agency report, is alone almost sufficient to establish reasonable cause for the bank to believe Jacobs insolvent and that the assignments were intended to grant it a preference. There are, however, other significant items of evidence—not to mention the admissions made by the defendant's officers in the bankruptcy proceedings. The sudden demand for collateral, when none had been required during the period when the indebtedness was being reduced from $20,000 to $13,000; the knowledge that Jacobs was living improvidently; that he had failed to redeem his promise to apply the proceeds of his real estate towards reducing the bank's claim, but had instead put the money in his business, a fact that was known to the bank more than a month before the first assignment; his unbusinesslike dealings with the bank, pointedly evidenced by his indifference to the maturity of his notes; the efforts made by the bank to have Jacobs consent to the appointment of a trustee, justifying the inference that it had knowledge of the mismanagement of the business, coupled with the bank officers' declaration that, unless a trusteeship was resorted to, it would be disastrous to all parties interested; and, finally, the remarkable situation created by the bank, by which Jacobs was forced to the necessity of drawing checks on a personal account that had no funds in it except such as the bank chose, by the fiction of bookkeeping entries, to place therein. The bank officials must have known that a merchant who would submit to such a necessity had all other sources of supply cut off; was not only in great financial distress, but absolutely insolvent. While many of the facts recited, as well as others that might be gleaned from the record, can, separately considered, be reconciled with a condition of solvency, yet, when all are marshaled and considered in their relation to each other, there is in my mind, at least, no escape from the conclusion that Jacobs was insolvent, and that the defendant had reasonable cause to believe him so, and to believe that his transfers were intended as a preference.

The plaintiff insists that this conclusion warrants a recovery on his part of the total of all the accounts that were at any time collected by the defendant and amounting to $35,029.26. This claim goes too far. There was present consideration in honoring the Jacobs' checks and

notes for all but $13,000, omitting the cost of collection and the small surplus paid over to the plaintiff. The assignment of those accounts, the proceeds of which were applied to the discharge of Jacobs' debts to third parties, did not constitute a preference, under the bankruptcy law. Tiffany v. Boatman's Institution, 18 Wall. 375, 21 L. Ed. 868; Matter of Cobb (D. C.) 96 Fed. 821.

The plaintiff's attempt to recover the amount collected by the bank on the theory that the whole transaction was void under the state law, as had with an intent to hinder, delay, and defraud creditors, fails for insufficient proof.

Let there be judgment for the plaintiff to the extent indicated.

Judgment for plaintiff.