## TIFFANY *v.* BOATMAN'S INSTITUTION.

1. Although a loan of money may be usurious and the contract to return it void, yet, in the absence of statutory enactment, it does not follow that the borrower, after he has once repaid the money, nor even that his assignee in bankruptcy, whose rights are in some respects greater than his own, can recover the principal and illegal interest paid.   Equity, however, in its discretion may enable either to get back whatever money the borrower has paid in excess of lawful interest; and in the present suit it did enable an assignee in bankruptcy to do so; both in a case

---

* 41 Missouri, 416.          † 13 Illinois, 486.
‡ Jackson *v.* Cadwell, 1 Cowen, 644.

where before his bankruptcy the money was lent directly to the bankrupt, and in a case where the money had been given to brokers, upon indorsed notes, which, the evidence made sufficiently plain, were accommodation notes, drawn to enable the bankrupt to raise money on them, and were understood by the lender of the money so to be.

2. A man really insolvent, but not having yet openly failed, and hoping to overcome his difficulties and to carry on his business, violates no provision of the Bankrupt Act by pledging his property for money lent; the money being lent at the time when the pledge is made, and the lender having no reason to suppose otherwise than that the purpose of the loan is to give effect to hopes, such as above described, of the party borrowing.

APPEAL from the Circuit Court for the District of Missouri; the case being thus:

There was living in St. Louis in 1869, and for many years previously, a person named Darby, originally, as it seemed, a member of the bar, but who afterwards entered into various sorts of business, including, as a chief one, that of an exchange broker and a so-called "banker." He had no capital worth speaking of, when he entered into them, nor any considerable cash means at any time. He was always scheming, and as respected ready money always more or less embarrassed. He was, however, regarded as a man of wonderful energy and capacity for business, and though "suspending" in seasons of fiscal embarrassment, would manage to get on his feet again when the monetary crisis would be passed, and so go on anew. In this way he managed to work along for many years, never at any time being broken up. In 1868 he found himself with large property and with large debts—these being due to a considerable number of creditors, not a few of them by deposit with him as a banker—and all the time needing ready money in order to keep up appearances and to save himself from open failure. Whether he was at this time, in fact, insolvent was a matter about which different people differed. For the purposes of this case, he was conceded by the court to have been so; though it seemed that he never so regarded himself.

There existed at the same time in St. Louis, and in the later part of Darby's career, a corporation called the Boat-

man's Savings Institution, a company authorized by its charter to lend money. The charter, however, forbade the institution to lend at more than 8 per cent. for any loan; but prescribed no penalty, nor declared what should otherwise follow as a consequence for lending at higher rates.

The general statutes of Missouri concerning interest, declares that no person shall receive more than 10 per cent.* The act proceeds:

"SECTION 5. If any action or suit shall hereafter be commenced upon any bond, note, mortgage, specialty, agreement, contract, promise or assurance whatever, which shall be made within this State, the defendant may in his answer show that a higher or greater rate of interest than 10 per cent. per annum was therein or thereby agreed for, or received or taken; and if the answer of the defendant to any such suit shall be sustained by the verdict of a jury, or the finding of the court, the court shall render judgment on such verdict or finding for the real sum of money or price of the commodity actually lent, advanced or sold, and interest on the same at the rate of 10 per centum per annum; upon which judgment the court shall cause an order to be made, setting apart the whole interest for the use of the county in which such suit may be brought, for the use of common schools; and the same, when collected, shall be paid over accordingly, and go to and form a part of the common school fund of such county; and the defendant may recover his costs."

With these provisions by way of penalty, the whole subject seemed to end; and if the debtor voluntarily paid the money borrowed no penalties were prescribed.

Among Darby's borrowings of money, were two with the Boatman's Institution.

The first was in this way. The county of St. Louis wishing to build a jail issued proposals for sale of its bonds, which for convenience were to be issued in sums of $1000 each. Darby took one hundred and fifty of them ($150,000), at rates considerably below par, and borrowed the money to pay the county from the National Bank of Missouri; pledg-

---

* General Statutes of Missouri, 1865, p. 401, chap. 89, § 4.

ing the bonds as security collateral to his notes for the sum borrowed. For some reason not specifically disclosed, Darby after a certain time wished to pay his debt to this bank. In this condition of things, one Hogeman, the cashier of the Boatman's Institution, offered, in behalf of the institution, to lend him, at 10 per cent. interest, $135,000 (with which sum he could withdraw the bonds then in pledge with the National bank), and to take the bonds as collateral security for a note which Darby should give; Darby to have full power to sell the bonds from time to time at his own price; the amount received to be credited on his note. This arrangement was completed, that is to say Darby gave his note for $135,000, at 10 per cent., to the institution, withdrew the bonds from the National Bank of Missouri, deposited them with the institution, sold them at such rates as he saw good—fair ones—and by which (throwing out of consideration the usurious rates that he paid for money) he rather gained than lost, and with the proceeds paid his note to the institution with the 10 per cent. interest.

Next, as to the other of the two transactions abovementioned; this other, however, being rather a series of transactions, six in number, than a single one.

As already said, Darby was always embarrassed for ready money; always borrowing, and always wanting to borrow. As a banker his creditors by deposit amounted to $170,000, while he seldom or never had more than about $5000 to meet their drafts. To meet these and other claims he was constantly raising money through street-brokers, especially through one named Stagg. Darby, generally speaking, would come to him for money, proposing to draw notes which should be indorsed by Messrs. Brotherton & Knox, gentlemen of known character and means, for the amount wanted. Stagg would then go to the Boatman's Institution, see the cashier, and learn whether the institution was disposed to lend the amount wanted. If the reply was in the affirmative, Darby would draw and sign a note, Messrs. Brotherton & Knox would indorse it, Stagg would take it and get the money, deduct his broker's commission, and

pass the balance to Darby. This sort of operation was carried on for a certain time, the Boatman's Institution at the end of it, that is to say in January, 1869, being the holder of six notes for $5000 each, which, with interest on them, at rates never less than 10 per cent., and sometimes near 18 per cent., were paid, by a sale of certain real property of Darby's, made in April, 1869, through the agency of Hogeman.*

Before the 17th of June, of the year just mentioned, Darby had become too notoriously embarrassed to go on longer with his business; and at a meeting of his creditors held on that day he was told by one of them that he must file his petition to be adjudged a bankrupt, or that he would be forced into bankruptcy. He did accordingly file such his petition, on the 1st of July, and on the 12th was adjudged a bankrupt, one Tiffany being appointed his trustee.

Hereupon Tiffany, as such trustee, filed a bill in the court below against the Boatman's Institution to recover from it, as having been lent at usurious rates and in violation of the Bankrupt Act, the moneys which it had lent to Darby, that is to say, the $135,000, for which he had given the one note, and the $30,000 for which he had given the six notes, and both and all of which loans, as already said, Darby had paid. The provisions of the Bankrupt Act relied on were certain ones in the thirty fifth section, thus:

"And if any person, being insolvent or in contemplation of insolvency or bankruptcy, within six months before the filing of the petition . . . makes any *payment*, sale, assignment, transfer, conveyance, or other disposition of any part of his property to any person who then has reasonable cause to believe him to be insolvent . . . and that such payment, sale, assignment, transfer, or other conveyance is made with a view to prevent his property coming to his assignee in bankruptcy, or to prevent the same being distributed under this act . . . the sale, assignment, transfer, or conveyance shall be void and the assignee may recover the property or the value thereof as assets of the bankrupt."†

---

* This sale is described in Tiffany v. Lucas, 15 Wallace, 411.

† 14 Stat. at Large, 534. The word "payment," in the last paragraph, is left out in the statute as printed.

The bill did not ask for a decree for the *excess* of interest reserved and taken, over lawful rates, but asked for all the money lent to Darby and repaid by him. The grounds on which it proceeded were apparently these:

I. That at the time of the making of all these notes and of the payments on and of them, Darby was insolvent, and that both he and the Boatman's Institution had cause to know, and did know, that fact; that the payments were thus made with an intent to give the defendant a preference over other creditors, and in violation of the provisions of the Bankrupt Act, and were received with knowledge that such preference was intended and given; and finally, that such violation and fraud was contemplated and accomplished.

II. That the general statute of Missouri declaring the effects of usury and diverting the interest from the lender but saving the principal to him, applied only to " persons," that is to say, to natural persons, and did not include corporations; that therefore loans by corporations at rates forbidden by law—usurious loans—stood upon general principles; and being illegal were wholly void; that applying these principles—

1st. *To the case of the $135,000, evidenced by the one note;* that the loan being illegal and not anything which the law would regard as a loan, the note given as evidence of it was void, and the attempted transfer of jail-bonds as security no valid transfer; that therefore there was in law no security held by the Boatman's Institution for the note of $135,000; that accordingly any payments made to the Boatman's Institution stood upon the same ground as any other payments made by an insolvent debtor to an unsecured creditor.

2d. *To the case of the $30,000, evidenced by the six notes;* that the money had undoubtedly been lent to Darby, and was known by the Boatman's Institution (Hogeman's, its cashier's, knowledge being *its* knowledge) to have been so; that the loan being at above 8 per cent. it was void, and the payments, transfers, or gifts of money without consideration.

III. That independently of these general principles, the matter of the $135,000 was specially open to censure; that

the manner in which the subject of the jail-bonds, given for the purpose of securing the $135,000, had been arranged by Darby and the company (Darby taking the bonds from the National Bank of Missouri, where he had them on just the same sort of loan as he was about to put them with the Boatman's Institution, except apparently that the bank would not let him appear as owner of them and sell them, and being allowed to put them in the Boatman's Institution on pledge, and yet to manage as his own and sell them as if he were absolute owner), gave to him a fictitious credit and enabled him to defraud his creditors. The special form of the transaction thus involved the Boatman's Institution in complicity with his fraudulent intent.

That though equity might not enable Darby, he being a party to the unlawful dealings, to recover what he had once voluntarily paid, it would enable his assignee under the Bankrupt Act, who was acting for creditors, and was therefore not to be affected by Darby's complicity in the unlawful arrangements, when its effect was to injure *them*.

The bill was resisted on various grounds, including the one that the general statute of Missouri about usury did apply to corporations, a position for which *The Bank of Louisville v. Young*\* was cited, as also a provision in the General Statutes "on the construction of statutes," in which it was thought to be declared that under the term "person" corporations were included;† and that for the rest, equity would not enable the assignee of a bankrupt to pay even the bankrupt's just debts, out of other men's money, because the bankrupt had borrowed money at illegal rates and repaid it, and that the most it would do would be to put him where he would have been had he paid no more than lawful interest; that is to say, would enable him to recover the surplus.

The court below thought that the first transaction—that of the $135,000—it being a transaction directly with Darby—

---

\* 37 Missouri, 406.    † General Statutes of 1865, p. 83, chapter 9, § 4.

was unlawful so far as concerned any interest above 8 per cent., the lawful rate, but that it was lawful for the residue. While, as to the other transaction or series of transactions— the transaction or transactions about the six notes of $5000 each, $30,000 in all—assuming, as the court did, that none of these loans were to Darby directly, but were purchases by the Boatman's Institution in the market of negotiable paper, made by Darby to third parties, by them indorsed, and which the institution might naturally believe that *such third parties had thrown on the market for their own purposes*— it held that there was *nothing* unlawful—not even the excess of interest—in *them*.

From a decree to this effect and from a ruling which had excluded certain evidence tending to prove Darby's insolvency at the time of the transactions, the assignee took this appeal.

*Messrs. E. R. Hoar and S. Knox, for the assignee in bankruptcy, appellant; Mr. T. T. Gantt, contra.*

Mr. Justice DAVIS delivered the opinion of the court.

The general statute of Missouri concerning usury allows an individual to receive ten per cent. per annum interest for the loan of money; but, if more be taken and suit is brought to enforce the contract, and the plea of usury be interposed, the whole interest is forfeited to the proper county for the use of schools. The debtor is not released from his obligation to pay, but the interest is diverted from the parties and appropriated for school purposes. If, however, the borrower suffers judgment to go against him, without pleading usury, or if, without suit, he pays the usurious interest, he cannot, either at law or in equity, maintain an action for its repayment. This was settled in *Ransom* v. *Hays*,[*] and affirmed in *Rutherford* v. *Williams*,[†] and these decisions would be conclusive of this controversy, unless it is affected by the Bankrupt law, if the legislature intended the general provisions

---

[*] 39 Missouri, 448.          [†] 42 Id. 85.

of this act to apply to loans by artificial as well as natural persons, although the former might be restricted to a less rate of interest than the latter. It is contended by the defendant that this act was meant to apply to corporations, and that if a bank, discounting a note in the course of business, commits usury, it is subject to precisely the same consequences with an individual. On the other hand, the complainant insists that the legislature did not intend in this matter to place corporations on the same footing with natural persons, and cites in support of this position *The Bank of Louisville* v. *Young.** But the facts of that case did not involve the construction of a contract made by a corporation created by an act of the legislature of Missouri. The point decided there was that a note given to secure a loan made in foreign bank notes by a foreign corporation doing business by an agent in St. Louis, contrary to the provisions of an act to prevent illegal banking, was void.

We have been referred to no case in the courts of Missouri, nor are we aware of any, in which the question has been directly presented whether the general law relating to usury applies to and has the same effect upon a contract made in violation of its charter by a bank as upon a contract made by an individual. The question is one of great importance to the business interests of that State, and may be far-reaching in its consequences, and as it is not necessary to decide it in order to dispose of this case, in accordance with the principle on which the Circuit Court placed its decree we prefer to leave its decision to the State tribunals. Assuming, then, that this defendant is not within the purview of the general usury statute of the State, what are the consequences that must attach to it for taking excessive interest from Darby? The bill proceeds on the idea that the provision of the charter being violated all the loans to Darby were *ultra vires* and void, and as they were made to him within four and six months of his adjudication as a bankrupt, with the knowledge of the defendant during the whole

* 37 Missouri, 406.

course of its dealing with him that he was insolvent, the complainant has, in his character of trustee, the right to recover for the use of his trust all the sums of money paid to the defendant by Darby, because paid in fraud of the Bankrupt Act.

The defendant is by its charter authorized to lend money on interest, but is forbidden to exact more than 8 per cent. for the loan. No penalty is prescribed for transgressing the law, nor does the charter declare what effect shall be given to the usurious contract. This effect must, therefore, be determined by the general rules of law. The modern decisions in this country are not uniform on the question whether, if the bank takes more than the rate prescribed, the contract shall be avoided or not on these general rules; nor is this a matter of surprise if we consider the growing inclination to construe statutes against usury so as not to destroy the contract. It is, however, unnecessary to review these cases, or the earlier ones in England and this country, which uniformly hold that the contract is avoided, because this court has in the case of *The Bank of the United States* v. *Owens,*\* decided the question. The bank in that case brought suit upon a promissory note that was discounted at a higher rate of interest than 6 per cent., which was the limit allowed by its charter upon its loans or discounts. The charter, like that of the Boatman's Institution, did not declare void any contract transcending the permitted limits, nor affix any penalty for the violation of the law. It was contended in that case, as it has been in this, that a mere prohibition to take more than a given per cent. does not avoid a contract reserving a greater rate, and that when a contract is avoided, it is always in consequence of an express provision of law to that effect. But the court held otherwise, and decided that such contracts are void in law upon general principles; "that there can be no civil right where there is no legal remedy, and there can be no legal remedy for that which is illegal." Chief Justice Taney, in the Maryland circuit, as

---

\* 2 Peters, 527.

late as 1854, in a similar case, held similar views, and supported them by the decision in this case.* It must, therefore, be accepted as the doctrine of this court, that a contract to do an act forbidden by law is void, and cannot be enforced in a court of justice.

But it does not follow in cases of usury, if the contract be executed, that a court of chancery, on application of the debtor, will assist him to recover back both principal and interest. To do this would be to aid one party to an illegal transaction and to deny redress to the other. Courts of equity have a discretion on this subject, and have prescribed the terms on which their powers can be brought into activity. They will give no relief to the borrower if the contract be executory, except on the condition that he pay to the lender the money lent with legal interest. Nor, if the contract be executed, will they enable him to recover any more than the excess he has paid over the legal interest.† In recognition of this doctrine the court below rendered a decree for the excess of interest over 8 per cent. per annum exacted of Darby on the note for $135,000, and dismissed the bill as to all other claims.

The six accommodation notes, which the defendant alleges were purchased from note brokers, were really taken on loans to Darby, and the illegal interest received above 8 per cent. on them should, on the principle of that decree, be refunded, as much as that upon the larger note. It is true that usury is only predicable of an actual loan of money, and equally true that a negotiable promissory note, if a real transaction between the parties to it, can be sold in the market like any other commodity. The real test of the salability of such paper is whether the payee could sue the maker upon it when due. He could do this if it was a valid contract when made, otherwise not. Mere accommodation paper can have no effective or legal existence until it is transferred to a *bonâ fide* holder. It follows, then, that the

* Dill *v.* Ellicott, Taney's Circuit Court Decisions, 233.

† Story's Equity Jurisprudence, 1 vol., 10th edition by Redfield, §§ 300, 301, 302.

discounting by a bank at a higher rate of interest than the law allows of paper of this character, made and given to the holder for the purpose of raising money upon it, in its origin. only a nominal contract, on which no action could be maintained by any of the parties to it if it had not been discounted, is usurious, and not defensible as a purchase. The point was decided in New York at an early day,\* and this decision recognized and approved by this court in *Nichols* v. *Fearson*,† and the general current of decision is in the same direction.‡

There are cases which hold that the purchaser of such paper is protected, if he took it in good faith of the holder, without knowledge of its origin, and in the belief that it was created in the regular course of business.§ Whether this limitation of the rule be correct or not, it is not important to inquire, as the decision of the question under consideration does not rest upon it.

The six notes which are the basis of the transaction complained of, were executed by Darby, solely for the purpose of raising money upon them, indorsed by Brotherton & Knox for his accommodation, and delivered by him to Stagg and other street brokers to be negotiated. This negotiation was effected with the Boatman's Institution, and it is perfectly manifest that the cashier, in purchasing the paper, did not suppose he was advancing the money for the benefit of the brokers who held them, or of Brotherton & Knox, who indorsed them. They were doubtless purchased because the security was deemed sufficient, but it is impossible to conceive that the cashier did not know the paper to be of that class called accommodation, as it is conceded that Brotherton & Knox were gentlemen of large pecuniary ability, and had no occasion to go upon the street to get paper held

---

\* Munn *v.* Commission Co., 15 Johnson, 55.          † 7 Peters, 103.

‡ Munn *v.* Commission Co., 15 Johnson, 55; Powell *v.* Waters, 17 Id. 176; Wheaton *v.* Hillard, 20 Id. 289; Powell *v.* Waters, 8 Cowen, 669; Corcoran & Riggs *v.* Powers, 6 Ohio State, 37; 3 Parsons on Contracts, 6th ed., p. 144, and cases cited in note S.

§ 3 Parsons on Contracts, p. 145, and cases cited in the note on that page.

by them *bonâ fide,* against Darby or any one else, discounted. Indeed, Stagg says the notes were negotiated for Darby s benefit, and explains in some instances how it was done. Darby would apply to him for money on his paper, and he would go to the Boatman's Institution to see if the cashier would take it, and if the reply was in the affirmative, the paper would be made, taken to the bank, and the money obtained on it. Can any rational person suppose, in the absence of any direct evidence, that the cashier in dealing with Stagg thought he was dealing with the owner of the notes? The presumption is that street brokers act for others, not themselves, and that the cashier was well acquainted with this course of business. If so, he knew, or ought to have known, that Darby wanted the money, and that the paper was made to enable him to get it, and for no other purpose. This being the case, the transaction can be viewed in no other light than as a loan of money directly to Darby, and as he paid more than 8 per cent. for its use, the Circuit Court erred in not ordering the excess to be refunded.

The remaining question to be considered is, whether, in this case, the rights of the trustee are greater than those of Darby. It is certainly true, in very many cases, he can do what the bankrupt could not, because he represents the creditors of the insolvent. If, for instance, the bankrupt should create a trust which was designed to conceal his property from creditors, although equity would not lend its aid to him to enforce the trust, it would to his assignee for the benefit of creditors.* And many other examples might be cited in illustration of the rule, but it would be a waste of labor to do so. The point is whether, under the facts of this case, the bill will lie to recover back both principal and interest paid on the loans by Darby, when, as we have seen, if he had not been declared a bankrupt, and had filed it in his own behalf he could have only recovered the excess of interest paid beyond the charter rate.

It is very clear if the loans in controversy had been made

---

* Carr *v.* Hilton, 1 Curtis, 235.

at legal rates, and were not fraudulent in fact, they could not be impeached. There is nothing in the Bankrupt law which interdicts the lending of money to a man in Darby's condition, if the purpose be honest and the object not fraudulent. And it makes no difference that the lender had good reason to believe the borrower to be insolvent if the loan was made in good faith, without any intention to defeat the provisions of the Bankrupt Act. It is not difficult to see that in a season of pressure the power to raise ready money may be of immense value to a man in embarrassed circumstances. With it he might be saved from bankruptcy, and without it financial ruin would be inevitable. If the struggle to continue his business be an honest one, and not for the fraudulent purpose of diminishing his assets, it is not only not forbidden, but is commendable, for every one is interested that his business should be preserved. In the nature of things he cannot borrow money without giving security for its repayment, and this security is usually in the shape of collaterals. Neither the terms nor policy of the Bankrupt Act are violated if these collaterals be taken *at the time* the debt is incurred. His estate is not impaired or diminished in consequence, as he gets a present equivalent for the securities he pledges for the repayment of the money borrowed. Nor in doing this does he prefer one creditor over another, which it is one of the great objects of the Bankrupt law to prevent. The preference at which this law is directed can only arise in case of an antecedent debt. To secure such a debt would be a fraud on the act, as it would work an unequal distribution of the bankrupt's property, and, therefore, the debtor and creditor are alike prohibited from giving or receiving any security whatever for a debt already incurred if the creditor had good reason to believe the debtor to be insolvent. But the giving securities *when* the debt is created is not within the law, and if the transaction be free from fraud in fact, the party who loans the money can retain them until the debt is paid. In the administration of the bankrupt law in England this subject has frequently come before the courts, who have uniformly held that advances

may be made in good faith to a debtor to carry on his business, no matter what his condition may be, and that the party making these advances can lawfully take securities at the time for their repayment.   And the decisions in this country are to the same effect.*   Testing this case by this rule, there is no difficulty about it on the theory that the loans were not made in excess of lawful interest.

There is nothing to invalidate the jail-bond transaction. If it was unwise in Darby to purchase these bonds the defendant did not advi e it, and is not, therefore, chargeable with the fictitious credit which, it is alleged, he obtained by reason of the purchase.   So far as the evidence shows the purchase was accomplished before the defendant knew of it. It is a fair inference of fact that the National Bank of Missouri was tired of carrying the loan which Darby made of it in order to buy the bonds, and that the effect of the loan from this defendant was to prevent their sacrifice.   At any rate the creditors of Darby were not harmed by the transaction, for the bonds when sold realized more than they cost; nor was any wrong intended by Darby.   The money was not borrowed to conceal it from creditors, but to take valuable securities out of pledge.   This Darby had the right to do, and the defendant in helping him to do it was guilty of no fraud on creditors, nor was any contemplated.   On the contrary, so far as we can see, the creditors were benefited by the substitution of the Boatman's Institution for the National Bank of Missouri.   At all events Darby's estate was in no wise impaired by the transaction.   The securities were valid in the hands of the defendant, and Darby could lawfully apply the proceeds arising from their sale to repay the advances made by it.

If the six accommodation notes had been discounted at

---

* Hilliard on Bankruptcy, ch. 10, p. 333, ? 10; Hutton *v.* Cruttwell, 1 Ellis & Blackburn, 15; Bittlestone *v.* Cooke, 6 Id. 296; Harris *v.* Rickett, 4 Hurlstone & Norman, 1; Bell *v.* Simpson, 2 Id. 410; Lee *v.* Hart, 34 English Law and Equity, 569; Hunt *v.* Mortimer, 10 Barnewall & Cresswell, 44; Ex parte Shouse, Crabbe, 482; Wadsworth *v.* Tyler, 2 Bankrupt Register, 101.

legal rates the loan would have been equally unimpeachable. Conceding that the bank had good reason to believe Darby to be insolvent, the proceeding, as we have seen, was not necessarily fraudulent as a matter of law, and there is nothing in the evidence to show that it was fraudulent in fact. The loans were not made to defeat creditors or delay them, or to conceal property from them, nor was such their effect. The paper on which they were based was taken as other paper with good indorsers is taken in the regular course of business. There is no evidence that the money was used improperly, or that the bank supposed it would be. Darby, doubtless, raised the money hoping to be able to go on with his business; not to defeat his creditors, but to pay them.

If it were clear at the time to his mind that he could overcome his difficulties (as we think it was), notwithstanding the real state of his affairs did not justify the belief, his conduct was not in fact fraudulent, nor is it condemned by any provision of the Bankrupt law.

Does the fact, then, that the interest reserved on the notes in controversy exceeded the charter rate, change these transactions, which were lawful if not tainted with usury, so that the trustee can recover back the whole sum; when, as we have seen, Darby, if suing personally, could only recover the excess? We think not. The trustee in this matter has no larger interest than the bankrupt. The estate of Darby is diminished, by reason of his dealings with this defendant, to no greater extent than the usurious interest which he has paid. This the trustee should obtain as proper assets to be administered, but to allow him to get what he asks, would be to transfer to the creditors of Darby, a sum of money exceeding $150,000, which he never owned, by way of punishment of the bank for taking excessive interest. A court of equity does not deal with contracts affected with usury in this way. The relief it gives is always based' on the idea that the money borrowed with legal interest shall be paid.*

We have not considered the point raised about the exclu-

---

* 1 Story's Equity, §§ 301–302.

sion of evidence, because, at the most, the evidence, if admitted, would only have been cumulative on the subject of Darby's insolvency and the defendant's knowledge; and we have treated the case on the theory that the officers of the institution knew, when they made the loans and received payment of them, that Darby was insolvent.

The case will have to go back for the purpose of enabling the Circuit Court to ascertain in some proper way the excess of interest over the charter rate paid on the six accommodation notes, and to enlarge the decree so as to cover that sum. In all other respects the disposition of this case by the Circuit Court was correct.

DECREE REVERSED, and the cause remanded with directions to proceed
                    IN CONFORMITY WITH THIS OPINION.