**LOWELL et al. v. BROWN,**
and five other cases.

In re PONZI.

(District Court, D. Massachusetts. March 17, 1922.)

Nos. 1166, 1182, 1263, 1578, 1580, 1642.

**1. Bankruptcy ⬅298—Right to recover preference held not barred by laches.**

In a suit to recover a preference brought by trustees in bankruptcy on the last day of the year normally allowed for filing claims, a plea of laches, grounded upon the theory that the defendant, if defeated, has lost his right to prove his claim, cannot be sustained; section 57n of the Bankruptcy Act (Comp. St. § 9641) having been construed to allow proof of such claims after liquidation by litigation, although subsequent to the year.

**2. Bankruptcy ☞164—Infant cannot be required to repay preference.**

An infant receiving back from a bankrupt money paid to the bankrupt for investment cannot be required by the trustees in bankruptcy to repay it as a preference.

**3. Bankruptcy ☞164—Defendant held not required to repay as preference money recovered by him for another.**

Where a part of the money recovered by defendant from a swindling scheme was invested in his name by another without his knowledge, and he had repaid to the other the amount of such investment after he recovered it, defendant cannot be required to repay that portion of his recovery to the trustees in bankruptcy as a preference.

**4. Bankruptcy ☞279—Equitable suit for preference involves same issues as if brought at law.**

Suits in equity by trustees in bankruptcy to recover unlawful preferences, under Bankruptcy Act, § 60b (Comp. St. § 9644), are not suits to set aside payments in fraud of creditors, or for the settlement of conflicting equities, but are technical preference suits, and involve the same issues as if they had been brought at law in the state court, as they might have been.

**5. Bankruptcy ☞164—Preference must be payment from bankrupt's property.**

A payment, to amount to a preference under Bankruptcy Act, § 60, must be a payment or transfer of the property of the bankrupt, and there can be no preferential transfer without a depletion of the bankrupt's estate.

**6. Bankruptcy ☞164—Repayment of money obtained by bankrupt's fraud is not a preference.**

Where money was fraudulently obtained by the bankrupt from defendants, and they elected to rescind and to recover their payments, which the bankrupt permitted them to do, the payments were not from the bankrupt's property, and did not diminish the estate, and the defendants were not strictly creditors, although they had provable claims, if they elected to rely on their contract.

**7. Bankruptcy ☞363—Rescission for fraud is inconsistent with claim in bankruptcy.**

Though proof of a claim in bankruptcy does not bar an action for deceit which affirms the fraudulent contract, it is inconsistent with a rescission of the contract for fraud, followed by an attempted recovery in specie of the property fraudulently obtained.

**8. Bankruptcy ☞164—Repayment of money fraudulently obtained held not depletion of bankrupt's estate.**

Where defendants elected to rescind their contracts with the bankrupt for his fraud, and to recover money paid by them, the repayment to them did not deplete the bankrupt's estate, even if such payment was not made from a deposit containing the money paid in by the defendants, since by recovering the amount of their payments from the bankrupt's general fund they released an equal amount of the funds held by him as trustee ex maleficio.

**9. Bankruptcy ☞303(1)—Burden is on trustee to prove bankrupt's estate was diminished by alleged preferences.**

In an action by the trustees in bankruptcy to recover preferences, the burden is on them to prove that the payment to defendants diminished the bankrupt's estate, which is essential to establish the preference.

**10. Bankruptcy ☞363—Money fraudulently obtained from those who filed claims is property of bankrupt.**

Where the bankrupt had fraudulently obtained money from numerous investors, who, after the bankruptcy, elected to file claims therefor against the estate, thus treating themselves as creditors ab initio, the money so received must be regarded as the bankrupt's money; that is, as money loaned to him, and not as money held in trust by him.

11. **Trusts** ⟨key⟩358(2)—**Withdrawal from mixed funds is presumed to be of trustees' money.**

Where a deposit in a bank was made up in part of bankrupt's own funds and in part of funds held in trust for him by defendant, his withdrawals from the deposits must be presumed to have been first made from his own money, leaving the money held in trust in the deposit.

12. **Bankruptcy** ⟨key⟩303(3)—**Evidence held to show alleged preferences were paid from trust funds.**

In suits to recover as preferences repayments of money fraudulently obtained from defendants and repaid to them on rescission of their contracts, evidence *held* to show that the repayments were made from the money of defendants deposited in the same account with that of the bankrupt, and not from the money of the bankrupt.

13. **Bankruptcy** ⟨key⟩166(4)—**Facts held to show payees had reason to suspect insolvency.**

Where defendants, when they elected to rescind their contracts for fraud, had read or heard of a newspaper report stating that their payee was insolvent and that he had been paying earlier investors from the contributions of the later investors, they had more than reasonable cause to suspect insolvency when they received their payments.

14. **Bankruptcy** ⟨key⟩166(4)—**Payee must have reasonable cause to believe payments were made from bankrupt's estate.**

To establish a preference, the payees must not only have had reasonable cause to believe that the bankrupt was insolvent, but also that the payment would effect a preference, which involved a belief that the payment was to be made from the funds of the bankrupt, and not from the contributions fraudulently obtained from them.

15. **Bankruptcy** ⟨key⟩159—**Classification in preference section does not apply to conflicting claims of creditors and beneficiaries of trust.**

The classification of creditors in Bankruptcy Act, § 60, relating to preferences, refers to creditors entitled to priority, as distinguished from general unsecured creditors, but has no application to the conflicting claims between the beneficiaries of a trust fund and creditors of the bankrupt.

In Equity. Six separate suits by James A. Lowell and others, as trustees in bankruptcy of Charles Ponzi, against Benjamin Brown, against H. W. Crockford, against Patrick W. Horan, against Frank W. Murphy, against Thomas Powers, and against H. P. Holbrook, to recover preferences paid to defendants. Bill dismissed in each case.

See, also, 272 Fed. 536.

James A. Lowell and William R. Sears, both of Boston, Mass., for trustees.

John H. Devine, Louis Goldberg, William H. Powers, Jr., John P. Leahy, Philip Dexter, and Edward A. Counihan, Jr., all of Boston, Mass., for defendants.

ANDERSON, Circuit Judge. I. These six preference cases, brought by the trustees in bankruptcy of Charles Ponzi, were, by agreement, heard together. They are described by counsel as intended to test, in the Court of Appeals, questions common to many hundred suits now pending and yet to be filed. While they are brought on the equity side of the court, the defendants have not objected that the plaintiffs have a full, adequate, and complete remedy at law. I assume that such objection, if valid, may be waived. Compare Warmath v. O'Daniel, 159 Fed. 87, 86 C. C. A. 277, and cases cited in note

⟨key⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

found in 16 L. R. A. (N. S.) 414; First State Bank of Milliken v. Spencer, 219 Fed. 503, 135 C. C. A. 253, and cases cited; Black on Bankruptcy (3d Ed.) § 401.

By these typical suits the plaintiff trustees seek to recover from the defendants, who paid money to Ponzi, and thereafter demanded and received back the same sums, without interest or profit, the amounts thus paid and received, as unlawful preferences. The amounts involved and the dates of payment and receipt may be tabulated as follows:

| Name of Defendant. | Amt. Involved. | Date paid in. | Date Received Back. |
|---|---|---|---|
| Benjamin Brown | $1,200 | July 20 and 24, 1920 | August 2, 1920 |
| H. W. Crockford | 1,000 | July 24, 1920 | August 2, 1920 |
| Patrick W. Horan | 1,600 | July 24, 1920 | August 4, 1920 |
| Frank W. Murphy | 600 | July 22, 1920 | August 4, 1920 |
| Thomas Powers | 500 | July 24, 1920 | August 3, 1920 |
| H. P. Holbrook | 1,000 | July 22, 1920 | August 4, 1920 |
| | $5,900 | | |

All the transactions fall within a period of about two weeks, between July 20 and August 4, 1920. All of the defendants received notes in the following typical form:

"The Securities Exchange Company, for and in consideration of the sum of exactly $1,000, receipt of which is hereby acknowledged, agree to pay to the order of ———, upon presentation of this voucher at ninety days from date, the sum of exactly $1,500 at the company's office, 27 School street, room 227, or at any bank.        The Securities Exchange Company,
        "Per Charles Ponzi."

The Securities Exchange Company was nothing but Ponzi.

These notes were all given back to Ponzi, when the defendants rescinded and received and cashed checks for like amounts, as hereinafter set forth. Defendants plead in some legally sufficient form that they were all victims of Ponzi's fraud; that they elected to rescind, and did rescind; also that they had no reasonable cause to believe that the receipt of these moneys would effect preferences.

II. In December, 1919, Ponzi began, in a small way, selling such 50 per cent. 90-day notes, representing, in substance, that he had discovered that, through the use of international reply postal coupons, or the manipulation of foreign exchange, or both, he was able to make, within a very short time, 100 per cent. on all money intrusted to him, and was generously sharing this astounding profit with investors who should furnish him the money to enable him to do the business on a large scale. If, at the outset, he had any capital at all of his own, it apparently did not exceed $150. For present purposes, it may be assumed that he started as a penniless swindler. His scheme was simply the old fraud of paying the earlier comers profits out of the contributions of the later comers. In some fashion he caused it to be generally understood that, although his notes were written on 90 days' time, he would redeem them in 45 days. By the spring of 1920 this scheme had, apparently through advertising by word of mouth of recipients of the 50 per cent. profit, spread like an infectious disease through the community. By July he was receiving contributions at the rate of about

$1,000,000 a week. The aggregate in the period from some time in December, 1919, until the bankruptcy petition against him was filed on August 9, 1920, was between $9,000,000 and $10,000,000, received from perhaps 15,000 to 20,000 people. The scheme was, of course, a pure swindle. At no time did he deal substantially, probably not at all, in international coupons, or in any other speculation in foreign exchange. On this record every note buyer or depositor was a victim of fraud. Counsel on both sides agree in the view that, as to all moneys so received, Ponzi was, when he received them, a trustee ex maleficio, unless, of course, his investors stood on their rights under the notes, which, for present purposes, I assume they might legally do.

[1] In the Horan case, No. 1580, is a plea of laches which may as well be disposed of before dealing with the vital points.

Ponzi was adjudicated a bankrupt on October 25, 1920. The suit against Horan was begun on October 24, 1921, although actual service was not made until some days later. The plea of laches goes upon the theory that if Horan should be defeated he would have lost his right to prove his claim, because of the expiration of the year on October 25, 1921—an inequitable result. The plea rests upon what appears to be a mistaken theory of the construction put upon Bankruptcy Act, § 57n (Comp. St. § 9641). That section reads:

"Claims shall not be proved against a bankrupt estate subsequent to one year after the adjudication; or if they are liquidated by litigation and the final judgment therein is rendered within thirty days before or after the expiration of such time, then within sixty days after the rendition of such judgment."

The latter part of this provision, pertinently referred to by Judge Learned Hand as "the singularly blind language of the second sentence of section 57n" (see In re John A. Baker Notion Co. [D. C.] 180 Fed. 922, 924), has been construed so as to leave the door open to parties, situated like these defendants, to prove their claims at the expiration of litigation adverse to them. See In re Bergdoll Motor Co., 233 Fed. 410, 147 C. C. A. 346; Page v. Rogers, 211 U. S. 581, 29 Sup. Ct. 159, 53 L. Ed. 332; Keppel v. Tiffin Savings Bank, 197 U. S. 356, 25 Sup. Ct. 443, 49 L. Ed. 790; Hutchinson v. Otis, 115 Fed. 937, 942, 53 C. C. A. 419. Other decisions are collected in 1 Remington, Bankruptcy (2d Ed.) §§ 717, 727½; Collier, Bankruptcy (10th Ed.) § 746; Black, Bankruptcy, § 526. This plea of laches cannot be sustained.

III. While all the cases are, on the main issues, similar, the Brown case, No. 1263, is, in two material aspects, distinguishable. The defendant is an infant, and defends by his guardian ad litem. It also appears that of the sum of $1,200 paid in by him on two days, July 20 and 24, one-half, $600, was, without Brown's knowledge, put in his name by another infant, Gross, a friend of Brown. Gross made the investment in Brown's name, fearing that his family would have the good sense to object if they learned of it. Brown collected the whole $1,200 under circumstances common to all of the cases, and turned over Gross' half, $600, to him. The plaintiffs nevertheless contend that Brown is liable for the whole $1,200.

[2] No case is cited in which an infant has been held liable in a bankruptcy preference case. The plaintiffs cite and rely upon Christopher

v. Norvell, 201 U. S. 216, 26 Sup. Ct. 502, 50 L. Ed. 732, 5 Ann. Cas. 740. In that case it was held that a married woman, residing in Florida, where common-law incapacities still obtained, could, under R. S. § 5151, be held to pay an assessment on shares in a national bank inherited by her. I think the case not in point. I rule that Brown is, on the ground of infancy alone, entitled to a decree. MacGreal v. Taylor, 167 U. S. 688, 17 Sup. Ct. 961, 42 L. Ed. 326; Tucker v. Moreland, 10 Pet. 58, 9 L. Ed. 345.

[3] It also seems clear to me that, even if Brown is liable, he cannot be held for money which was invested by and paid back to Gross, the other infant. I so rule.

[4] IV. Turning now to the main issues: It is important to keep clearly in mind that these are suits to recover unlawful preferences and nothing else. On no other ground has this court jurisdiction. See section 60b of the Bankruptcy Act (Comp. St. § 9644). They are not suits to set aside payments in fraud of creditors, or for settling conflicting equities among defrauded cestuis que trustent. They are technical preference suits. They might have been brought in a state court and tried before a jury. The issues here are precisely the same as they would have been in the state court on the law side. In order to recover, the plaintiffs must fully prove their cases under section 60 of the Bankruptcy Act. The issues here presented are quite other than those before the court in the Bolognesi Case, 254 Fed. 770, 166 C. C. A. 216, or in the Matthews Case, 238 Fed. 785, 151 C. C. A. 635. See, also, In re Stewart (D. C.) 178 Fed. 463.

[5, 6] As it is admitted that Ponzi was insolvent and that the payments were made by him within four months, those elements of a voidable preference are made out. But the statute requires a payment or transfer "of his property"; that is, the bankrupt's property, not the property that he might merely possess, but which was not distributable under the Bankruptcy Act to his creditors. 2 Collier, Bankruptcy (12th Ed.) p. 885, and cases cited. "There can be no preferential transfer without a depletion of the bankruptcy estate." 2 Collier, Bankruptcy, supra; 2 Black on Bankruptcy (3d Ed.) § 576; In re Schwab (D. C.) 258 Fed. 772. No one contends that the return of goods secured by fraud constitutes a preference. Precisely so, in my view, as to the repayment of the defendants' money procured by fraud. Ponzi's estate in bankruptcy was not diminished by his returning to them money that belonged to them, and not to him as a debtor and prospective bankrupt. They were not at that time, strictly speaking, creditors. They were victims of fraud, asserting, with Ponzi's assent, the right to rescind. 2 Black on Bankruptcy (3d Ed.) §§ 582, 583, 584. They did not stand on their notes; they gave them up, canceled.

Of course these defendants, and all other victims, were creditors of Ponzi in the sense that they had provable claims. Crawford v. Burke, 195 U. S. 176, 25 Sup. Ct. 9, 49 L. Ed. 147; Tindle v. Birkett, 205 U. S. 183, 27 Sup. Ct. 493, 51 L. Ed. 762; Clarke v. Rogers, 228 U. S. 534, 33 Sup. Ct. 587, 57 L. Ed. 953. So far as now appears, they could prove on the notes. And apparently, since the amendment of

1903 (32 Stat. 798 [Comp. St. § 9586 et seq.]), they might prove claims for the amounts they paid without waiving the torts and being barred by a discharge. Friend v. Talcott, 228 U. S. 27, 33 Sup. Ct. 505, 57 L. Ed. 718; same case, 179 Fed. 676, 103 C. C. A. 80, 43 L. R. A. (N. S.) 649. An action for deceit affirms, it does not disaffirm, a fraudulently induced sale or loan. Compare Cheney v. Dickinson, 172 Fed. 109, 96 C. C. A. 314, 28 L. R. A. (N. S.) 359; Frey v. Torrey, 70 App. Div. 166, 75 N. Y. Supp. 40.

[7] These cases hold that an action for deceit may be brought, even if the victim of the fraud has, by proof in bankruptcy, affirmed the transaction to the extent of allowing full title to the money or property to pass to the worker of the fraud. But clearly they could not prove a claim for money fraudulently obtained from them, and at the same time seek to recover from the bankrupt estate the same sum of money in specie. Rescission (followed by an attempted recovery in specie) and a right to share in the distribution in bankruptcy, are plainly inconsistent remedies. Hewitt v. Hayes, 205 Mass. 356, 91 N. E. 332, 137 Am. St. Rep. 448.

[8] But our present concern is as to the title to the moneys paid Ponzi, not as to rights for subsequent actions for deceit. These defendants neither waived the tort nor made any claim on the general assets, if there were then or thereafter any general assets. They claimed the right to rescind, gave up their notes, and took back the exact sums they paid in, so that their dealings with Ponzi neither increased nor diminished the amount of assets, which remained for distribution exactly the same as if they had had no dealings at all with him. Compare Illinois Parlor Frame Co. v. Goldman, 257 Fed. 300, 168 C. C. A. 384.

In that case, the appellant had been fraudulently induced to raise the bankrupt's credit from $1,000 to about $6,000. On discovering the fraud, instead of rescinding the sale of the goods thus fraudulently procured, book accounts to the amount of about $4,000 were turned over to him. The decision below that this was a voidable preference was reversed by the Court of Appeals, opinion by Circuit Judge Mack. The court said:

"But on June 9th appellant concededly had a right to rescind the fraudulent sales and to recover back such of the goods as were then in the bankrupt's possession. Clearly a return of these goods would not be a preference; to the extent of their value, payment could no more effectuate a preference; neither transaction would diminish the estate to which bankrupt was then entitled. That appellant did not expressly assert a right of rescission is immaterial; it relinquished that right in confirming the sale; it then gave up the property interest equal to the value of the goods then on hand. To that extent the transfer was for a present consideration, and not preferential."

This case is in point. The defendants here, like the appellant in that case, "concededly had a right to rescind" the transaction and get back their money. The plaintiffs concede that if they did "get back *their* money"—that is, money that came out of a fund identified as one including their contributions—there was no preference. But, even if Ponzi paid them out of money derived from those who, by subsequently proving their claims, either on their notes or for the amounts paid in, waived the right to rescind, his estate was not diminished; for the de-

fendants' money, thus freed from the trust ex maleficio, remained in his possession as an exact offset. They relinquished their right to a sum, the exact equivalent of the sum they received. ( :e the learned discussion of the law as to commingled and identified trust funds, by District Judge Ray, in Re Stewart (D. C.) 178 Fed. 463, 470, 477. Compare Smith v. Mottley, 150 Fed. 266, 80 C. C. A. 154; Board of Com'rs of Crawford County v. Strawn, 157 Fed. 49, 84 C. C. A. 553, 15 L. R. A. (N. S.) 1100; Peters v. Bain, 133 U. S. 670, 693, 10 Sup. Ct. 354, 33 L. Ed. 696; Tiffany v. Boatman's Sav. Institution, 18 Wall. 375, 21 L. Ed. 868.

Moreover, if the money with which Ponzi paid these defendants came technically out of a fund made up in whole or in part of money belonging to other cestuis, who have not waived the torts, it is far from clear that such moneys ever became Ponzi's estate within the meaning of the Bankruptcy Act. Compare National Bank of Newport v. National Bank of Little Falls, 225 U. S. 178, 184, 185, 32 Sup. Ct. 633, 56 L. Ed. 1042; New York County Bank v. Massey, 192 U. S. 138, 147, 24 Sup. Ct. 199, 48 L. Ed. 380. It is plain, however the legal[u] elements are stated, that Ponzi's "estate," if he had any, was neither increased nor diminished by the short-lived, fraudulently induced contributions, and withdrawals of these defendants.

[9] But plaintiffs contend "that the burden is upon the defendants to show that the checks which they received were drawn on and paid from a deposit which, as matter of law, the defendants might have charged with a trust for the amount of such checks." They cite for this proposition In re Matthews, 238 Fed. 785, 151 C. C. A. 635; In re Bolognesi, 254 Fed. 770, 166 C. C. A. 216; In re Kearney (D. C.) 167 Fed. 995.

Neither of these first two cases was a preference case. Both were petitions to revise orders of distribution of funds among special claimants, in which the courts proceed under general equity principles, and not in accordance with the specific requirements of the preference statute. As I construe them, they have little or no bearing on the questions here presented, which, as already stated, are questions of technical statutory preferences.

This contention as to burden of proof cannot, in my view, be sustained. 2 Black on Bankruptcy (3d Ed.) § 614. The burden is upon the plaintiffs to show that the defendants have received unlawful preferences. Even if, as the plaintiffs contend, the money paid by Ponzi to these defendants came out of deposits held by Ponzi as trustee ex maleficio for other dupes, I do not believe the plaintiffs can on that ground maintain these preference suits. They must show that Ponzi's estate—that is, an estate distributable to Ponzi's creditors (not belonging in equity to cestuis)—was diminished by the payments made to these defendants.

On all the evidence, I find and rule that the defendants were not, when paid, creditors within the meaning of section 60 of the Bankruptcy Act, and also that Ponzi's estate was not diminished by these payments.

But, even if the burden of proof is upon the defendants to show that their moneys came back out of a deposit charged with a trust in

their behalf, I think that that burden has been sustained. It is undisputed, and I find, that the defendants' moneys were deposited not later than one day after their payments to Ponzi, in the Hanover Trust Company, with other moneys extracted from other victims by similar frauds. I also find that all the moneys were repaid on the dates above set forth by checks drawn on Ponzi's account in the Hanover Trust Company. Three checks were certified; three were not.

These six checks were promptly cashed at the Hanover Trust Company. But in this connection, at the plaintiffs' request, I find, if material, that approximately 500 other checks were given by Ponzi for the sums originally contributed by the recipients thereof, for amounts not shown in the evidence, either seriatim or in the aggregate, and that such checks had not, at the beginning of the bankruptcy proceedings, been cashed; that claims in bankruptcy grounded on such checks were filed and allowed. It does not appear whether any of said unpaid checks were or were not ever presented to the Trust Company for payment. Counsel agree that the accounts in the Hanover Trust Company, although carried in several names, were all Ponzi's accounts. The relation of the defendants' payments and receipts to this fund in the Hanover Trust Company will be more clearly shown by setting forth a consolidated statement, prepared by the plaintiffs' expert accountant, of these accounts from July 19 to August 11, 1920, inclusive.

### Hanover Trust Company.
#### Consolidation of All the Charles Ponzi Accounts.
##### Deposits.

|  | Less Transfers. | Transfers. | Total. | Withdrawals. | Balance. |
|---|---|---|---|---|---|
| 1920. | 334,726.69 |  | 334,726.69 |  | 334,726.69 |
| July 19. | 193,296.79 |  | 193,296.79 | 101,500 | 426,523.48 |
| 20. | 273,713.18 |  | 273,713.18 | 18,513.22 | 681,723.44 |
| 21. | 273,802.98 |  | 273,802.98 | 1,869.24 | 953,657.18 |
| 22. | 285,847.66 |  | 285,847.66 | 503,350. | 736,154.84 |
| 23. | 270,992.92 |  | 270,992.92 | 73,117.34 | 954,030.42 |
| 24. | 100,000 | 100,000 |  | 62,284.94 | 871,745.48 |
| 26. | 528,458.76 | 55,850.70 | 584,309.46 | 572,098.77 | 883,956.17 |
| 27. | 563,541.79 |  | 563,541.79 | 288,172.95 | 1,159,325.01 |
| 28. | 254,195.75 | 300,000 | 554,195.75 | 905,719.10 | 1,107,801.66 |
| 29. | 760,058.63 |  | 760,058.63 | 508,235.16 | 1,059,625.13 |
| 30. |  |  |  | 405,127.25 | 654,497.88 |
| 31. | 23,072.50 |  | 23,072.50 | 168,514.35 | 509,056.03 |
| Aug. 2. |  |  |  | 387,619.52 | 121,436.51 |
| 3. | 40,600 | 400.000 | 440,600 | 541,870.84 | 20,165.67 |
| 4. | 359,080 | 299.600 | 658,680 | 295,172.47 | 313,737.08 |
| 5. | 256,360.58 | 25,000 | 281,360.58 | 524,585.04 | 140,448.74 |
| 6. | 259,999.38 | 283,709.62 | 543,709 | 249,999.32 | 434,158.42 |
| 7. | 68,768.34 | 204,950.58 | 136,182.24 | 556,949.34 | 13,391.32 |
| 9. | 31,471.11 | . | 31,471.11 | 376,740.50 | 331,878.07 |
| 10. | 471,393.08 | 9,300 | 480,693.08 | 151,349.99 | 2,534.98 |
| 11. | 9,300 |  | 9,300 |  | 6,765.02 |
|  | $5,021,143.46 | $1,678,410.90 | $6,699,554.36 | $6,692,789.34 | $   6,765.02 |

The items in the column headed "Transfers" refer to sums gathered by Ponzi into the Hanover Trust Company from other banks. The items in the first column are payments of victims like the defendants. All the moneys of these defendants were deposited in this Trust Com-

pany not earlier than July 20, or later than July 26, 1920. (July 25 was Sunday).

Brown's, the earliest case, may be taken as typical. The plaintiffs contend that, because the amount on deposit on July 20, $681,723.44, was, if all the intervening withdrawals were applied to that balance alone, fully withdrawn by July 26 at the latest, the payment on August 2 to the defendant Brown did not come out of a fund which included his original contributions of July 20 and 24 of $1,200.

[10] Undoubtedly, as already set forth, all the deposits made in the Hanover Trust Company were funds originally belonging in equity to Ponzi's dupes; they all had a right to give up their notes and demand their moneys back, because obtained from them by fraud. But it is admitted that of the large sums (about $3,500,000) deposited between July 20 and August 5 a great part came from victims who subsequently filed claims in bankruptcy of about $4,000,000, thus electing to treat themselves as creditors ab initio, rather than as cestuis que trustent. Even if Ponzi stopped issuing new notes on July 26, as is claimed, approximately $2,500,000 of depositors' money was, in the period from July 26 to August 4, put into the Hanover Trust Company.

It follows that all moneys received and paid by such creditor victims must be regarded, for present purposes, as Ponzi's money; i. e., money loaned to him. Compare Crawford v. Burke, 195 U. S. 176, 25 Sup. Ct. 9, 49 L. Ed. 147; Hewitt v. Hayes, 205 Mass. 356, 363, and cases cited on page 364, 91 N. E. 332, where it is explicitly ruled that such depositors, by proving in bankruptcy, elect as their remedy to be creditors. So proving, they lost their right to rescind; their money was loaned to Ponzi.

[11] The result is that the entire deposit in the Hanover Trust Company was of a mixed fund, made up in part of the trustees' (Ponzi's) own funds, and in other part of money belonging to the defendants and to other similar cestuis. It is well settled that, when a wrongdoing trustee makes withdrawals from such a mixed fund, the presumption is that he first withdraws his own money, and not the trust money. Hewitt v. Hayes, 205 Mass. 356, 361, 91 N. E. 332, 137 Am. St. Rep. 448, and cases cited; National Bank v. Insurance Co., 104 U. S. 54, 26 L. Ed. 693; Richardson v. Shaw, 209 U. S. 365, 28 Sup. Ct. 512, 52 L. Ed. 835, 14 Ann. Cas. 981; In re Hallett's Estate, 13 Ch. Div. 696; National City Bank v. Hotchkiss, 231 U. S. 50, 34 Sup. Ct. 20, 58 L. Ed. 115; Southern, etc., Oil Co. v. Elliotte, 218 Fed. 567, 571, 134 C. C. A. 295; In re Stewart (D. C.) 178 Fed. 463. Ponzi's drafts on this fund during this period were therefore of money loaned to him, at least in large part.

It follows that on August 4, after the defendants had cashed all their checks, there still remained at least $20,165.67 of the fund on deposit on July 20, when Brown's money went into the trust fund; for this was the smallest balance on any day now material. If we take the next earlier transactions, Horan's and Holbrook's, on July 22, these sums were part of a balance of $736,154.84, and after their withdrawal on August 4, there was a balance of $313,737.08. It is obvious that we need not resort to the theory of the restoration to an exhausted trust

fund from moneys of the defaulting trustee, in order to meet the claim that the moneys of these defendants were not repaid from general assets of a bankruptcy estate.

[12] On all the evidence I find that the defendants' money went, on or almost immediately after the dates of the payments, into an identified deposit in the Hanover Trust Company, and there remained until it was repaid to them by checks drawn as above set forth. In other words, so far as the defendants' rights are concerned, the trust fund in the Hanover Trust Company remained unaffected by the large deposits and withdrawals between July 20 and August 5.

Mention may be made of the fact that, in addition to the moneys appearing in this consolidated account in the Hanover Trust Company, Ponzi had actually there on deposit $1,500,000 more, represented by time certificates of deposit taken out for the purpose of preventing embarrassment to the bank through which the Hanover Trust Company checks were cleared. While these certificates were negotiable, they were not in fact negotiated. They were grounded on moneys received prior to the earliest date here significant, July 20.

Plaintiffs contend, and on this point I think they are right, that the existence of this additional fund of $1,500,000 has nothing to do with the issue here involved. There is no evidence that any part of that $1,500,000 was derived from these defendants, or that any of their payments came out of it. But, if material, it is a fact that Ponzi had in this Trust Company during the period in question a deposit ranging from $2,500,000 down to little over $1,500,000.

[13] V. But, if wrong in the conclusions so far stated, did the defendants have reasonable cause to believe that the payments to them would effect a preference? If and in so far as such "reasonable cause to believe" means simply that they had reasonable cause to believe that Ponzi was insolvent, I find that they did have such reasonable cause to believe. On the morning of August 2, 1920, there was published in the Boston Post a report, headlined in great letters, to the effect that Ponzi was insolvent. I am satisfied that all of the defendants either saw this report or heard enough of its contents, so that they knew that one McMasters, who was or had been in Ponzi's employ, reported in substance that Ponzi was insolvent, and to the effect that he had been paying earlier comers out of the proceeds of later comers' contributions. Apart from this published statement, it is difficult for one accustomed to dealing with realities to believe that any ordinarily intelligent person could regard the scheme as other than one that made its worker insolvent almost from the start. I think they had more than "reasonable cause to suspect insolvency." Compare Putnam v. United States Trust Co., 223 Mass. 199, 204, 111 N. E. 969; Rogers v. Am. Halibut Co., 216 Mass. 227, 229, 103 N. E. 689.

[14] But the statute requires more than reasonable cause to believe that Ponzi was insolvent. It requires reasonable cause to believe that such payments "would effect a preference"; that is, that "the effect of the" payments "will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class." But they were not demanding and receiving money as

creditors. They asked to have their money back, and, so far as they knew or "had reasonable cause to believe," they got back their own money.

On all the evidence I find that the defendants had no reasonable cause to believe that the money received by them by payment of the checks drawn on the Hanover Trust Company did not come from the specific fund into which their moneys had gone. I find this, even if, in fact, it did not come from such fund.

[15] Again, I am unable to find that these defendants had reasonable cause to believe that they were getting a greater percentage of their claims (assuming for the moment that such claimants are creditors) than other claimants "of the same class." I do not believe the classification of creditors in section 60 of the Bankruptcy Act has any application to the conflicting claims of claimants to share in a trust fund grounded wholly upon a scheme of fraud, or to the conflicting claims between the cestuis of such trust fund and creditors of the bankrupt, who have stood on their rights under the notes, or by other conduct have waived their right to rescind, so that their contributions have been, ab initio, transmuted into loans to the bankrupt. As a practical matter, the only claimants "in the same class" as these defendants would be other victims who have exercised or seek to exercise like rights to rescind. No such claimants are now before this court. Compare 2 Collier, Bankruptcy (12th Ed.) pp. 894, 895.

So far as I am aware, the classes of creditors referred to in the preference section are such creditors as those to whom taxes are owing, employees, and any others who by the laws of the states or of the United States are entitled to priority as distinguished from general unsecured creditors. 2 Collier, Bankruptcy, supra, p. 895. Such classification obviously does not fit this case.

In a word, I am unable to believe that the preference section of the Bankruptcy Act is applicable to this case. I find nothing supporting the plaintiffs' main contentions in Clarke v. Rogers, 228 U. S. 534, 33 Sup. Ct. 587, 57 L. Ed. 953; and Schuyler v. Littlefield, 232 U. S. 707, 34 Sup. Ct. 466, 58 L. Ed. 806. Compare Crawford v. Burke, 195 U. S. 176, 25 Sup. Ct. 9, 49 L. Ed. 147; Tindle v. Birkett, 205 U. S. 183, 27 Sup. Ct. 493, 51 L. Ed. 762; Friend v. Talcott, 228 U. S. 27, 33 Sup. Ct. 505, 57 L. Ed. 718.

In my view, no case cited, properly analyzed, supports the plaintiffs' contention. Both the issues and the record in this case are radically different from those before Judge Morton in Lowell v. Ashton (D. C.) 272 Fed. 536. There is nothing in that record indicating what Judge Morton's views would be on the questions with which I must deal. In effect, the plaintiffs seek a ruling that an insolvent swindler cannot assent to the rescission of any of his swindling transactions without thus making his temporary victims unlawfully preferred creditors, assuming bankruptcy within four months and reasonable cause to believe him insolvent. I am constrained to reject that proposition.

The bills must each be dismissed, with costs.